Filed 12/19/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| JERRY BEEMAN et al., | ) | |
| | ) | S203124 |
| Plaintiffs and Respondents, | ) | |
| | ) | |
| v. | ) | Ninth Cir. U.S. Ct. App. |
| | ) | No. 07-56692 |
| ANTHEM PRESCRIPTION | ) | |
| MANAGEMENT, LLC, et al., | ) | C.D. Cal. |
| | ) | No. CV 04–00407–VAP |
| Defendants and Appellants. | ) | |
| _____ | ) | |
| | ) | |
| JERRY BEEMAN et al., | ) | |
| | ) | |
| Plaintiffs and Respondents, | ) | |
| | ) | |
| v. | ) | Ninth Cir. U.S. Ct. App. |
| | ) | No. 07-56693 |
| TDI MANAGED CARE SERVICES, | ) | |
| INC., et al., | ) | C.D. Cal. |
| | ) | No. CV–02–01327–VAP |
| Defendants and Appellants. | ) | |
| _____ | ) | |

We granted a request from the United States Court of Appeals for the Ninth Circuit, sitting en banc, to address the following issue of state law pursuant to California Rules of Court, rule 8.548:  Does Civil Code section 2527 compel speech in violation of article I, section 2 of the California Constitution?

Civil Code section 2527 requires prescription drug claims processors to compile and summarize information on pharmacy fees and to transmit the information to their

1

clients. Defendants contend that this statute is a content-based speech requirement that cannot satisfy either strict scrutiny or intermediate scrutiny under California's free speech guarantee. Plaintiffs counter that the statute only requires the transmission of "objective, statistical data" and therefore does not implicate any free speech protection. In addition, plaintiffs contend that the statute, if it implicates a right to free speech, is ordinary economic regulation subject to rational basis review and, in any event, would satisfy the intermediate scrutiny standard that applies to restrictions on commercial speech.

As explained herein, we hold that Civil Code section 2527 does implicate the right to free speech guaranteed by article I of the California Constitution. At the same time, we hold that the statute, which requires factual disclosures in a commercial setting, is subject to rational basis review and satisfies that standard because the compelled disclosures are reasonably related to the Legislature's legitimate objective of promoting informed decisionmaking about prescription drug reimbursement rates.

## I.

In the panel decision now being reviewed en banc, the Ninth Circuit provided the following description of the parties to this litigation: "Plaintiffs own five independent retail pharmacies licensed in California. Defendants are current or former pharmacy benefit managers ('PBMs'). They 'contract with third-party payors or health plan administrators such as insurers, HMOs, governmental entities, and employer groups to facilitate cost-effective delivery of prescription drugs to health plan members or other persons to whom the third-party payors provide prescription drug benefits.' PBMs assist in the 'processing of prepaid or insured prescription drug benefit claims submitted by a licensed California pharmacy or patron thereof.' In other words, PBMs act as intermediaries between pharmacies and third-party payors such as health insurance companies. Pursuant to this role, PBMs may create networks of retail pharmacies that agree to accept certain reimbursement rates when they fill prescriptions for health plan members. According to Defendants, network reimbursements 'generally are lower than

2

what pharmacies would charge uninsured, cash-paying customers.' " (*Jerry Beeman and Pharmacy Services v. Anthem Prescription Management* (9th Cir. 2011) 652 F.3d 1085, 1090 (*Beeman II*).)

In 2002, plaintiffs filed a federal class action suit alleging that defendants failed to comply with Civil Code section 2527. (All further statutory references are to the Civil Code unless otherwise indicated.) Section 2527 imposes specific obligations on "prescription drug claims processor[s]" as a prerequisite of entering into or performing any contracts with licensed California pharmacies or processing or assisting with the processing of any prescription drug claim involving licensed California pharmacies. (§ 2527, subd. (a).) The act defines "prescription drug claims processor" as "any nongovernmental entity which has a contractual relationship with purchasers of prepaid or insured prescription drug benefits, and which processes, consults, advises on, or otherwise assists in the processing of prepaid or insured prescription drug benefit claims submitted by a licensed California pharmacy or patron thereof." (§ 2527, subd. (b).) For purposes of this litigation, defendants do not contest that they are "prescription drug claims processors" subject to section 2527. (*Beeman II*, *supra*, 652 F.3d at p. 1090, fn. 1.)

Section 2527, subdivision (c) requires prescription drug claims processors to "conduct[] or obtain[] the results of a study or studies which identifies the fees, separate from ingredient costs, of all, or of a statistically significant sample, of California pharmacies, for pharmaceutical dispensing services to private consumers. The study or studies shall meet reasonable professional standards of the statistical profession. The determination of the pharmacy's fee made for purposes of the study or studies shall be computed by reviewing a sample of the pharmacy's usual charges for a random or other representative sample of commonly prescribed drug products, subtracting the average wholesale price of drug ingredients, and averaging the resulting fees by dividing the aggregate of the fees by the number of prescriptions reviewed. A study report shall

3

include a preface, an explanatory summary of the results and findings including a comparison of the fees of California pharmacies by setting forth the mean fee and standard deviation, the range of fees and fee percentiles (10th, 20th, 30th, 40th, 50th, 60th, 70th, 80th, 90th). This study or these studies shall be conducted or obtained no less often than every 24 months."

Section 2527, subdivision (d) requires prescription drug claims processors to send the studies to their clients: "The study report or reports obtained pursuant to subdivision (c) shall be transmitted by certified mail by each prescription drug claims processor to the chief executive officer or designee, of each client for whom it performs claims processing services. Consistent with subdivision (c), the processor shall transmit the study or studies to clients no less often than every 24 months. [¶] Nothing in this section shall be construed to require a prescription drug claims processor to transmit to its clients more than two studies meeting the requirements of subdivision (c) during any such 24-month period. [¶] Effective January 1, 1986, a claims processor may comply with subdivision (c) and this subdivision, in the event that no new study or studies meeting the criteria of subdivision (c) have been conducted or obtained subsequent to January 1, 1984, by transmitting the same study or studies previously transmitted, with notice of cost-of-living changes as measured by the Consumer Price Index (CPI) of the United States Department of Labor."

Section 2528 provides for civil enforcement of section 2527: "A violation of Section 2527 may result only in imposition of a civil remedy, which includes, but is not limited to, imposition of statutory damages of not less than one thousand dollars ($1,000) or more than ten thousand dollars ($10,000) depending on the severity or gravity of the violation, plus reasonable attorney's fees and costs, declaratory and injunctive relief, and any other relief which the court deems proper. Any owner of a licensed California pharmacy shall have standing to bring an action seeking a civil remedy pursuant to this section so long as his or her pharmacy has a contractual relationship with, or renders

4

pharmaceutical services to, a beneficiary of a client of the prescription drug claims processor, against whom the action is brought provided that no such action may be commenced by the owner unless he or she has notified the processor in writing as to the nature of the alleged violation and the processor fails to remedy the violation within 30 days from the receipt of the notice or fails to undertake steps to remedy the violation within that period and complete the steps promptly thereafter."

Sections 2527 and 2528 were enacted in 1982. (Stats. 1982, ch. 296, § 1, pp. 936–938; Assem. Bill No. 2044 (1981–1982 Reg. Sess.) (Assembly Bill 2044).) The bill was sponsored by the California Pharmacists Association in an effort to increase the rate of reimbursement by third-party payors. (Assem. Com. on Finance, Insurance & Commerce, Analysis of Assem. Bill No. 2044 (1981–1982 Reg. Sess.) for hearing on May 12, 1981, p. 6 (Bill Analysis).) Assembly Bill 2044 was prompted not only by a concern with the reimbursement rates to pharmacists (see Bill Analysis, at pp. 1–2) but also by the United States Supreme Court's 1979 decision holding that the federal antitrust exemption for the "business of insurance," where regulated by state law, does not extend to contracts between insurers and pharmacies (*Group Life & Health Ins. Co. v. Royal Drug Co.* (1979) 440 U.S. 205; see Bill Analysis, at p. 5). As a result of that decision, pharmacists were unable to collectively bargain for fees or collectively refuse to participate in third-party payment programs. (Bill Analysis, at pp. 5, 7.)

As introduced, Assembly Bill 2044 would have imposed specific prices on prescription drug claims processors by requiring nongovernmental third-party payors to reimburse pharmacies for services rendered to group plan members at no less than the "usual charges of the pharmacy for the same or similar services to private consumers not covered by a group plan." (Bill Analysis, at pp. 1–2, underscoring omitted.) The bill also prohibited any third-party payor from imposing any payment systems in which the upper limit on claim payments was "less than the 90th percentile of usual charges within the state." (*Id.* at p. 2.) The bill was opposed by insurance companies, unions, and

5

healthcare service plans, all of which were concerned it would result in increased costs. (*Id.* at pp. 3–4.)  The Governor and the Department of Insurance also opposed the bill because it would "inhibit or prevent attempts by insurers at cost control" and "would have the probable result of raising the reimbursable amounts throughout a large portion of the state." (Legis. Counsel Brian L. Walkup, Dept. Insurance, letter to Assemblymember Bill Lancaster, June 2, 1981, p. 1.)

After failing to make it out of committee, Assembly Bill 2044 was amended to replace the minimum-reimbursement requirements with the current requirement that prescription drug claims processors conduct or obtain, and transmit to their clients, studies identifying the prevailing fees of California pharmacies for pharmaceutical dispensing services.  (Assem. Bill 2044, as amended Jan. 18, 1982.)  These changes were proposed by the original bill sponsor, the California Pharmacists Association.  (See John H. Simons, Cal. Pharmacists Association, mem., Dec. 22, 1981, in Assem. Com. on Finance, Insurance & Commerce bill file.)  As the bill's author explained in a letter to the Governor:  "An interim hearing of the Assembly Finance, Insurance and Commerce Committee last November established that because of antitrust constraints, pharmacists are unable to negotiate directly with the underwriters or processors.  And neither the underwriters or processors conduct statistical analyses of pharmacy pricing levels prior to adopting a reimbursement policy.  [¶]  These findings caused me to amend [Assembly Bill] 2044 to include essentially the provisions that are now before you . . . .  [¶]  I am hopeful that the legislation will serve to break the reimbursement logjam that has temporarily strained relationships between pharmacists, underwriters and claims processors."  (Assemblymember Bill Lancaster, letter to Governor (1981–1982 Reg. Sess.) June 14, 1982, Governor's chaptered bill files.)  The Department of Insurance offered this analysis of the enrolled bill:  "[T]he bill is significantly limited in scope . . . . [¶]  We point out that the bill is fairly innocuous in its impact, since it merely requires a study to be made and distributed to clients, and does not require any action to be taken

6

based on the study. Nevertheless, it may help identify areas for cost-containment in the future." (Dept. of Insurance, Enrolled Bill Rep. on Assem. Bill No. 2044 (1981–1982 Reg. Sess.) p. 2.)

Although section 2528 provides for private enforcement of section 2527, it does not appear that the statute prompted any litigation until 2002, when plaintiffs initiated a series of suits in federal and state court. In its request for this court's review, the Ninth Circuit, sitting en banc, provided this account: "Plaintiffs filed class action complaints against defendant prescription drug claims processors in the Central District of California in 2002 and 2004 (the *Beeman* cases) alleging, among other things, that Defendants failed to comply with the reporting requirements of section 2527. The district court dismissed the cases for lack of standing without reaching the merits. While Plaintiffs' appeal of the standing issue was pending in our court, three of the five plaintiffs sued some, but not all, of the defendants in Los Angeles Superior Court, again alleging violations of section 2527. The California Court of Appeal affirmed the trial court's dismissal of the suit in an unpublished opinion and declared section 2527 unconstitutional under article I, section 2 of the California Constitution. *See Bradley*[ *v. First Health Services Corp.* (Feb. 28, 2007, B185672) [nonpub. opn.] ]. The *Bradley* court relied on *ARP Pharmacy* [*Services, Inc. v. Gallagher Bassett Services, Inc.* (2006) 138 Cal.App.4th 1307, 1312] in which the Court of Appeal also found section 2527's reporting requirements unconstitutional. The California Supreme Court denied review of *Bradley* on June 13, 2007.

"In the *Beeman* cases, the Ninth Circuit panel concluded that Plaintiffs had standing, reversed the district court and remanded for further proceedings. *See Beeman v. TDI Managed Care* [*Services, Inc.* (2006)] 449 F.3d 1035, 1037 . . . . On remand, Defendants moved for judgment on the pleadings, arguing that section 2527 unconstitutionally compels speech in violation of both the United States and California Constitutions. Defendants based their constitutional arguments on the decisions in *Bradley*, *ARP* [*Pharmacy Services*], and *A.A.M.* [*Health Group, Inc. v. Argus Health*

7

*Systems, Inc.* (Feb. 28, 2007, B183468) [nonpub. opn.]].  Each of those California Court of Appeal decisions holds the reporting requirement of section 2527 unconstitutional under article I, section 2 of the California Constitution.  Denying Defendants' motions, the district court concluded that there was 'convincing evidence' that the California Supreme Court would not follow the holdings of the intermediate appellate courts. Defendants then filed this interlocutory appeal.

"The majority of a three-judge panel of this court also declined to follow the intermediate California court decisions striking down section 2527 as unconstitutional under California's free speech clause.  Instead, it independently assessed the constitutionality of the statute under First Amendment principles, reasoning that the California Supreme Court would decide the state constitutional question 'by relying, primarily, if not exclusively, on First Amendment precedent.'  *Beeman* [*II*, *supra*], 652 F.3d at 1094.  The majority identified two critical errors in the Court of Appeal decisions that it was convinced the California Supreme Court would not make:  (1) giving insufficient weight to *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) . . . and (2) misinterpreting *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).

"The dissent argued (1) we were bound by the *Erie* doctrine to follow the California Court of Appeal decisions; (2) the California Supreme Court would not necessarily rely upon First Amendment jurisprudence to interpret its own state's constitutional free speech clause, which 'enjoys existence and force independent of the First Amendment,' [citation], and is 'broader and more protective' than the First Amendment, [citation]; and (3) the California Courts of Appeal had in fact correctly analyzed First Amendment law and incorporated those principles into the decisions to strike down section 2527 under the California Constitution." (*Beeman v. Anthem Prescription Management, LLC* (9th Cir. 2012) 689 F.3d 1002, 1006–1007, fn. omitted

8

(en banc) (*Beeman III*), quoting *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 489, and *Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 366.)

The Ninth Circuit explained the need for guidance from this court as follows: "The outcome of this appeal is dictated by the scope of the free speech clause of the California Constitution as applied to section 2527. This constitutional question is critical to California's interest in consistent enforcement and interpretation of its constitution and laws in both state and federal courts. It is only because the panel's *Beeman* [*II*] decision has been withdrawn that the result that section 2527 is enforceable in federal, but not state, courts has been avoided. The majority of the three judge panel acknowledged that this situation, if left in place, would lead to forum shopping and the inconsistent enforcement of state law. [(See *Erie R. Co. v. Tompkins* (1938) 304 U.S. 64, 74–78.)] Without the California Supreme Court's examination of this question, the risk remains that the *en banc* court would follow the lead of the panel majority to the same end. If, of course, the California Supreme Court itself were to agree with the panel majority, then it too would conclude that the statute is constitutional, and its decision would control in California state and federal courts. The conflicting views of the law in the panel opinion illustrate the importance of this question in the context of (1) whether our court is bound to follow the precedent of *ARP Pharmacy* [*Services*], and (2) to what degree, if any, federal First Amendment precedent affects the constitutionality of section 2527 under California's free speech clause." (*Beeman III*, *supra*, 689 F.3d at p. 1007.)

We granted review in order to resolve this question of state constitutional law.

## II.

The free speech guarantee of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).)

In considering a free speech claim under article I, "we begin with the unquestioned proposition that the California Constitution is an independent document and its constitutional protections are separate from and not dependent upon the federal Constitution . . . ." (*Los Angeles Alliance for Survival v. City of Los Angeles*, *supra*, 22 Cal.4th at p. 365; see *Gerawan Farming, Inc. v. Lyons*, *supra*, 24 Cal.4th at pp. 489–490 (*Gerawan I*).) "The state Constitution's free speech provision is 'at least as broad' as [citation] and in some ways is broader than [citations] the comparable provision of the federal Constitution's First Amendment." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 958–959 (*Kasky*).) Unlike the First Amendment, California's free speech clause "specifies a 'right' to freedom of speech explicitly and not merely by implication," "runs against . . . private parties as well as governmental actors" and expressly "embrace[s] all subjects." (*Gerawan I*, at pp. 491–493.) However, "[m]erely because our provision is worded more expansively and has been interpreted as more protective than the First Amendment . . . does not mean that it is broader than the First Amendment in all its applications." (*Alliance for Survival*, at p. 367; see *Kasky*, at p. 969.) Our case law interpreting California's free speech clause has given respectful consideration to First Amendment case law for its persuasive value, while making clear that "federal decisions interpreting the First Amendment are not controlling." (*Alliance for Survival*, at p. 367.)

Applying this approach here, we examine the constitutionality of section 2527 by disentangling two questions: Does the statute's requirement that prescription drug claims processors transmit information on pharmacy fees to their clients implicate the right to freedom of speech under the California Constitution? If so, what level of judicial scrutiny applies to section 2527's speech requirement? We address the first question in this part and, answering it in the affirmative, turn to the second question in part III below.

As noted, section 2527 requires prescription drug claims processors to conduct or obtain, and to transmit to their clients, the results of studies identifying the fees charged by California pharmacies to private customers. The information at issue — a "study

10

report" that includes "a preface, an explanatory summary of the results and findings" that provide various statistics comparing pharmacy fees (§ 2527, subd. (c)) — is factual in nature. This statutorily required communication, we conclude, implicates California's free speech guarantee.

The text of California's free speech guarantee makes clear that the freedom to speak extends to "all subjects." (Cal. Const., art. I, § 2, subd. (a).) In *Gerawan I*, we emphasized the " 'unlimited' scope" of this language in contrast to the First Amendment, which "was 'not intended' to embrace all subjects." (*Gerawan I*, *supra*, 24 Cal.4th at pp. 493, 486.) Just as we observed in *Gerawan I* that the phrase "all subjects" in article I " 'does not exclude' commercial speech from its 'protection' " (*Gerawan I*, at p. 494), here we see no textual basis for excluding from article I's coverage factual statements like the study report required by section 2527.

Further, it is well established that freedom of speech under article I includes both the right to speak and the right to refrain from speaking. "Article I's right to freedom of speech, like the First Amendment's, is implicated in speaking itself. Because speech results from what a speaker chooses to say and what he chooses not to say, the right in question comprises both a right to speak freely and also a right to refrain from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say." (*Gerawan I*, *supra*, 24 Cal.4th at p. 491.) In *Gerawan I*, we observed that when article I was originally adopted in 1849, "the prevailing political, legal, and social culture was that of Jacksonian democracy," a culture that valued "equality and open opportunity, economic individualism, and wide and unrestrained commercial speech." (*Gerawan I*, at p. 495.) Informed by article I's text and the historical context of its adoption, we held — in a departure from then-controlling First Amendment precedent (*Gerawan I*, at pp. 497–509 [discussing *Glickman v. Wileman Bros. & Elliott, Inc.* (1997) 521 U.S. 457 (*Glickman*)]) — that a government order requiring a plum grower to fund generic

11

advertising about plums implicates (but does not necessarily violate) the right to freedom of speech under article I. (*Gerawan I*, at pp. 509–515, 517.) The broad principles set forth in *Gerawan I* — that article I's coverage of "all subjects" is " 'unlimited' in scope" (*Gerawan I*, at p. 493) and that the right to speak freely includes the right not to speak at all (*id.* at p. 487) — support the conclusion that a statute requiring transmission of factual information to a business entity in a commercial context implicates article I's free speech clause.

This understanding draws further support from principles articulated by the United States Supreme Court in interpreting "freedom of speech" under the First Amendment. The high court precedent involving speech that most closely approximates the factual information at issue in section 2527 is *Sorrell v. IMS Health Inc.* (2011) 564 U.S. __ [131 S.Ct. 2653] (*Sorrell*). There, the high court considered a First Amendment challenge to a Vermont law "restrict[ing] the sale, disclosure, and use of pharmacy records that reveal the prescribing practices of individual doctors." (*Id.* at p. __ [131 S.Ct. at p. 2659].) In discussing whether the "prescriber-identifying information" should be characterized as "a mere 'commodity' " or as protected speech, the high court noted the general rule that "the creation and dissemination of information are speech within the meaning of the First Amendment." (*Id.* at pp. __–__ [131 S.Ct. at pp. 2666–2667].) The high court then said: "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs. There is thus a strong argument that prescriber-identifying information is speech for First Amendment purposes." (*Id.* at p. __ [131 S.Ct. at p. 2667].) But the high court stopped short of deciding the issue and instead held that the state restriction, which specifically prohibited disseminating or using the information for marketing, worked an impermissible "speaker- and content-based burden on protected expression," "even assuming . . . that prescriber-identifying information is a mere commodity." (*Ibid.*)

12

In support of its suggestion that factual information qualifies as protected speech, the high court in *Sorrell* cited *Rubin v. Coors Brewing Co.* (1995) 514 U.S. 476 (*Rubin*), which invalidated a federal regulation banning disclosure of alcohol content on beer labels. (See *Sorrell*, *supra*, 564 U.S. at p. __ [131 S.Ct. at p. 2667].) In *Rubin*, there was no dispute that the brewing company sought "to disclose only truthful, verifiable, and nonmisleading factual information about alcohol content on its beer labels." (*Rubin*, at p. 483.) The high court concluded that the factual information about alcohol content was protected commercial speech and that restrictions on such speech require substantial justification, which the government in that case failed to provide. (*Id.* at pp. 481–486.)

The Ninth Circuit panel here recognized that the government "may not *prohibit* speakers from disseminating facts" but determined that it is "quite different" for the government to compel factual speech. (*Beeman II*, *supra*, 652 F.3d at p. 1100, fn. 14.) Citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, *supra*, 547 U.S. 47 (*FAIR*) and *Riley v. National Federation of Blind, supra*, 487 U.S. 781 (*Riley*), the Ninth Circuit panel concluded that "not all fact-based disclosure requirements are subject to First Amendment scrutiny. Instead, such requirements implicate the First Amendment only if they affect the content of the message or speech by forcing the speaker to endorse a particular viewpoint or by chilling or burdening a message that the speaker would otherwise choose to make." (*Beeman II*, at pp. 1099–1100, fn. omitted.) Respectfully, we do not believe *FAIR* or *Riley* supports the Ninth Circuit panel's conclusion that the reporting requirements of section 2527 "are not subject to *any* form of First Amendment scrutiny." (*Beeman II*, at p. 1106.)

*FAIR* rejected a First Amendment challenge by various law schools to the 1996 Solomon Amendment's requirement that institutions of higher education, as a condition of receiving federal funds, provide military recruiters the same access provided to other recruiters. (10 U.S.C. § 983.) Addressing the law schools' claim of compelled speech, the high court observed that "recruiting assistance provided by the schools often includes

13

elements of speech. For example, schools may send e-mails or post notices on bulletin boards on an employer's behalf. [Citations.] Law schools offering such services to other recruiters must also send e-mails and post notices on behalf of the military to comply with the Solomon Amendment." (*FAIR*, *supra*, 547 U.S. at pp. 61–62.) But the high court observed that "[t]he compelled speech to which the law schools point is plainly incidental to the Solomon Amendment's regulation of conduct" and explained that "[c]ompelling a law school that sends scheduling e-mails for other recruiters to send one for a military recruiter is simply not the same as forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die,' and it trivializes the freedom protected in [*Board of Education v*.] *Barnette* [(1943) 319 U.S. 624] and *Wooley* [*v. Maynard* (1977) 430 U.S. 705] to suggest that it is." (*FAIR*, at p. 62.)

In rejecting the law schools' compelled speech claim, *FAIR* did not hold that compelled statements of fact fall outside the ambit of First Amendment protection. To the contrary, the high court said that "these compelled statements of fact ('The U.S. Army recruiter will meet interested students in Room 123 at 11 a.m.'), like compelled statements of opinion, *are subject to First Amendment scrutiny*." (*FAIR*, *supra*, 547 U.S. at p. 62, italics added.) *FAIR* concluded that such compelled speech withstands First Amendment scrutiny because it does not force a school to speak the government's message or otherwise affect a school's ability to express its own viewpoints (*id.* at pp. 62–65) and because the speech is "only 'compelled' if, and to the extent, the school provides such speech for other recruiters" (*id.* at p. 62).

In *Riley*, the high court invalidated a North Carolina statute that, among other things, required professional fundraisers to disclose, " '[d]uring any solicitation and before requesting or appealing either directly or indirectly for any charitable contribution,' " the percentage of charitable collections actually remitted to charities over the past 12 months. (*Riley*, *supra*, 487 U.S. at p. 786, fn. 3, quoting N.C. Gen. Stat. § 131C-16.1.) In describing this requirement, the high court said: "Mandating speech

14

that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech." (*Riley*, at p. 795.) The high court then addressed the parties' dispute as to whether the disclosure requirement should be analyzed under the intermediate scrutiny standard applicable to commercial speech or under the strict scrutiny standard applicable to fully protected expression. In that discussion, the high court said that "even assuming, without deciding, that such speech in the abstract is indeed merely 'commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech," i.e., charitable solicitations. (*Id.* at p. 796.) Accordingly, *Riley* concluded that although "here we deal with compelled statements of 'fact' " and not "compelled statements of opinion," the disclosure requirement "burdens protected speech" and "is subject to exacting First Amendment scrutiny." (*Id.* at pp. 797–798.)

Contrary to the Ninth Circuit panel's suggestion (*Beeman II*, *supra*, 652 F.3d at pp. 1098–1099), *Riley* did not hold that the compelled factual disclosure at issue was subject to First Amendment scrutiny only because it was "inextricably intertwined with otherwise fully protected speech," i.e., charitable solicitations. (*Riley*, *supra*, 487 U.S. at p. 796.) The high court in *Riley* made the latter observation in the course of addressing what level of First Amendment scrutiny should apply to the disclosure requirement, not whether First Amendment scrutiny should apply at all. Before addressing what level of scrutiny should apply, the high court had already concluded that the disclosure requirement was "a content-based regulation of speech" because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." (*Riley*, at p. 795.)

The high court's analyses in the cases discussed above support the conclusion that the principle of freedom of speech protects " '[e]ven dry information, devoid of advocacy, political relevance, or artistic expression . . . .' [Citation.]" (*DVD Copy Control Assn. v. Bunner* (2003) 31 Cal.4th 864, 876.) The express compass of

15

California's free speech clause — "Every person may freely speak, write and publish his or her sentiments *on all subjects* . . . ." (Cal. Const., art. I, § 2, subd. (a), italics added) — reflects this principle. Accordingly, we conclude that section 2527 implicates the right to free speech under article I.

**III.**

A determination that a statute "implicates [the] right to freedom of speech under article I does not mean that it violates such right." (*Gerawan I*, *supra*, 24 Cal.4th at p. 517.) We now consider what level of judicial scrutiny applies to section 2527's requirement that prescription drug claims processors transmit to their clients a biennial study report on pharmacy fees.

The free speech jurisprudence of our court and the United States Supreme Court reveals no simple formula for deciding what level of scrutiny to apply to a particular speech regulation. Instead, the case law has distinguished carefully among various contexts in which compelled speech occurs and has sensitively considered the effects of compelled speech on both speakers and their audiences. (See *Riley*, *supra*, 487 U.S. at p. 796 ["Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon."].) In the compelled speech context, we have looked to First Amendment case law for persuasive guidance when confronted with a paucity of state constitutional doctrine. In *Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1, 11–22 (*Gerawan II*), we found it "critical" to examine several high court precedents on compelled subsidy of private speech in the course of concluding, partly in reliance on Justice Souter's dissenting opinion in *Glickman*, *supra*, 521 U.S. 457, that the proper test for evaluating the California Plum Marketing Program under article I's free speech clause was the intermediate scrutiny standard of *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 566 (*Central Hudson*). Here, as in *Gerawan II*, we find instructive "the cornerstones of United States Supreme Court jurisprudence" that have set

forth principles relevant to the novel state constitutional claim before us. (*Gerawan II*, *supra*, 33 Cal.4th at p. 11.) Informed by those principles and by basic notions of judicial restraint, we conclude that section 2527 is subject to rational basis review, not heightened scrutiny, under California's free speech clause.

## A.

The leading cases on compelled speech reflect the principle that no law may require a speaker to adopt a political or ideological viewpoint imposed by government. In *Board of Education v. Barnette*, *supra*, 319 U.S. 624 (*Barnette*), the high court struck down a West Virginia law requiring children in public schools to salute the flag and recite the Pledge of Allegiance. The court explained that "the compulsory flag salute and pledge requires affirmation of a belief and an attitude of mind. . . . To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." (*Id.* at pp. 633–634.) *Barnette* famously said: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." (*Id.* at p. 642.)

Three decades later, the high court in *Wooley v. Maynard*, *supra,* 430 U.S. 705 (*Wooley*) applied similar reasoning to invalidate a New Hampshire law prohibiting persons from covering up the state motto "Live Free or Die" on their car license plates. The appellees, who were Jehovah's Witnesses, claimed that the motto violated their moral and religious beliefs, and "New Hampshire's statute in effect require[d] that appellees use their private property as a 'mobile billboard' for the State's ideological message — or suffer a penalty . . . ." (*Id.* at p. 715.) Citing *Barnette*, the high court explained: "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary

components of the broader concept of 'individual freedom of mind.' " (*Wooley*, at p. 714.)

And just recently, the high court in *Agency for International Development v. Alliance for Open Society International, Inc.* (2013) 570 U.S. __ [133 S.Ct. 2321] held unconstitutional a federal law requiring nongovernmental organizations, as a condition of receiving federal funds to combat HIV/AIDS, to have a policy explicitly opposing prostitution. Again citing *Barnette*, the high court said the law offends the First Amendment because it "requires [organizations] to pledge allegiance to the Government's policy of eradicating prostitution." (*Alliance for Open Society*, at p. __ [133 S.Ct. at p. 2332]; see *id.* at p. __ [133 S.Ct. at p. 2330] [the law "demand[s] that funding recipients adopt — as their own — the Government's view on an issue of public concern"].)

In addition to invalidating laws that require speakers to adopt or endorse the government's political or ideological message, the high court's compelled speech jurisprudence has struck down laws requiring a speaker to carry another person's message with which the speaker disagrees. The paradigmatic case is *Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241 (*Tornillo*), which invalidated a Florida statute requiring newspapers that criticize a political candidate to provide free and equal space for the candidate to respond. The high court explained that the statute unconstitutionally interfered with "the exercise of editorial control and judgment," which includes "[t]he choice of material to go into a newspaper" and its "treatment of public issues and public officials — whether fair or unfair." (*Id.* at p. 258.) Under the statute, a newspaper must "print that which it would not otherwise print" (*id.* at p. 256), or "editors might well conclude that the safe course is to avoid controversy" by refraining from criticizing political candidates in the first place (*id.* at p. 257). Either way, the statute undermined the ability of newspapers to advance their own political or electoral views. (*Id.* at pp. 255–257; see also *Turner Broadcasting Systems, Inc. v. FCC* (1994) 512 U.S.

18

622, 640–641 ["laws that single out the press, or certain elements thereof, for special treatment . . . are always subject to at least some degree of heightened First Amendment scrutiny"].)

In *Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1 (*PG&E*), the high court struck down a California agency's order that required a utility company, in its billing envelopes, to include third-party materials critical of the utility's views. The plurality opinion observed that the order "discriminates on the basis of the viewpoints of the selected speakers" (*id.* at p. 12) by granting access to envelope space only "to persons or groups . . . who disagree with [the utility's] views." (*Id.* at p. 13.) Relying extensively on *Tornillo*, the four-justice plurality explained that "[w]ere the government freely able to compel corporate speakers to propound political messages with which they disagree, this protection would be empty, for the government could require speakers to affirm in one breath that which they deny in the next." (*PG&E*, at p. 16.) The agency's order violated the First Amendment "because it forces [the utility] to associate with the views of other speakers, and because it selects the other speakers on the basis of their viewpoints." (*Id.* at pp. 20–21; see also *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 574–575 [city may not require parade organizer to allow gay rights group to march in parade carrying its own banner because such "participation would likely be perceived as having resulted from the [parade organizer's] . . . determination . . . that [the gay rights group's] message was worthy of presentation and quite possibly of support as well," thus impinging on "the choice of a speaker not to propound a particular point of view"].)

In addition to "true 'compelled-speech' cases, in which an individual is obliged personally to express a message he disagrees with," the high court has applied similar reasoning to sustain First Amendment challenges in " 'compelled-subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity." (*Johanns v. Livestock Marketing Assn.* (2005) 544

19

U.S. 550, 557.)  In *United States v. United Foods, Inc.* (2001) 533 U.S. 405, the high court invalidated an assessment on mushroom producers that the Secretary of Agriculture imposed to fund generic advertisements promoting mushroom sales.  By expressing "[t]he message . . . that mushrooms are worth consuming whether or not they are branded," the generic advertising was at odds with "Respondent['s] [desire] to convey the message that its brand of mushrooms is superior to those grown by other producers."  (*Id.* at p. 411; see *id.* at pp. 410–411 ["First Amendment concerns apply here because of the requirement that producers subsidize speech with which they disagree."].)  Similarly, as noted, this court in *Gerawan II* held under the California free speech clause that intermediate scrutiny applied to a plum marketing order that compelled a plum producer with a distinctive brand to fund speech — again, generic advertising — with which it disagreed.  (See *Gerawan II*, *supra*, 33 Cal.4th at p. 10 [plaintiff plum grower alleged that " 'it "disagrees" with, and indeed "abhors," the generic advertising, otherwise undescribed, both on political and ideological grounds, as "socialistic" and "collectivist," and also on commercial grounds, as "grouping all . . . plums as though they are the same" and as "embarrassingly silly, idiotic and/or totally ineffective" ' "], quoting *Gerawan I*, *supra*, 24 Cal.4th at pp. 480–482.)

The statute at issue in this case, section 2527, does not implicate the free speech concerns that animate the cases above.  Each of those cases involved a law requiring a speaker to adopt, endorse, accommodate, or subsidize a moral, political, or economic viewpoint with which the speaker disagreed.  Compulsory allegiance to, association with, or subsidization of a viewpoint strikes at the heart of freedom of expression.  Section 2527, which requires prescription drug claims processors to transmit a study report on pharmacy fees to insurance companies, does not compel speech reflecting any viewpoint, belief, or ideology.  The study report required by section 2527 discloses objective facts and statistics about pharmacy fees.  The speech requirement here "is simply not the same as" forcing a speaker to support or accommodate an idea, belief, or opinion, and "it

20

trivializes the freedom protected in *Barnette* and *Wooley* [and the other cases discussed above] to suggest that it is." (*FAIR*, *supra*, 547 U.S. at p. 62.)

In attempting to analogize this case to the compelled speech precedents above, defendants argue that section 2527 requires them to associate with speech with which they disagree. Further, defendants contend that because "the pharmacist plaintiffs have argued that they intend to use the reports to lobby for mandatory higher reimbursement rates from claims processors," the statute "forces prescription claims processors to support a political position that is directly adverse to their interests." These contentions are not persuasive.

Although defendants object to transmitting the study reports to their clients, they do not identify any disagreement with the study reports themselves. As noted, section 2527, subdivision (c) prescribes a method for computing pharmacy fees for purposes of the study reports and specifies that the study reports shall include information about pharmacy fees presented in the form of particular facts, statistics, and comparisons. In pressing their free speech claim, defendants do not object to having to conduct or obtain the studies, nor do they claim that the statutory method of computing pharmacy fees, the specified format for presenting the data, or any information contained in the study reports is incorrect, misleading, or otherwise objectionable. Unlike the aggrieved speakers in all of the compelled speech precedents discussed above, defendants do not point to any speech with which they disagree.

Nor do defendants convincingly argue that section 2527 forces them to support a political position adverse to their interests. The possibility that pharmacists may use the study reports to influence public debate over reimbursement rate regulation does not mean that section 2527 makes prescription drug claims processors into conduits for the pharmacists' political message. For one thing, the study reports are not public documents; section 2527, subdivision (d) requires prescription drug claims processors to transmit the studies only to their clients, not to pharmacists or to the general public.

21

Further, defendants cite no evidence that pharmacists have used the reports to influence public debate, even though section 2527 has been the law for three decades.

More importantly, even if pharmacists were to use the study reports to advance their own policy views on reimbursement rates, the objective data in the reports are not themselves reasonably construed as conveying a political position that reimbursement rates are too low. The study reports may reveal that pharmacy fees charged to private customers are typically higher than network reimbursement rates. But this fact, which is already known and undisputed by the parties, entails no particular view on whether reimbursement rates should be increased, decreased, or kept the same — an issue implicating broader questions of health care economics and the proper balance among policy objectives such as ensuring access and containing costs.

Nor do we believe that defendants' transmission of the reports would cause their clients or anyone else to believe that defendants support the pharmacists' policy views. Justice Corrigan notes that although defendants "may have no quarrel regarding the *accuracy* of the data required to be reported," "they vehemently disagree that this data is at all *relevant* in determining proper reimbursement rates . . . ." (Conc. & dis., *post*, at pp. 14–15.) But section 2527 does not require defendants to affirm the relevance of the study reports to reimbursement rates, and mandatory transmission of the reports does not connote that defendants endorse their relevance. Nothing about the study reports suggests that defendants agree with the policy views of pharmacists or anyone else, and nothing in the statute restricts or compels any speech by defendants about the pharmacists' views, the relevance or irrelevance of the study reports, or reimbursement rates in general. (Cf. *FAIR*, *supra*, 547 U.S. at p. 65 ["Nothing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the Solomon Amendment restricts what the law schools may say about the military's policies."].) Defendants' clients and the public at large "can appreciate the difference between speech

22

[a company] sponsors and speech [a company engages in] because legally required to do so." (*Ibid.*)

Defendants further contend, relying on *Riley*, that the same level of scrutiny applies to compelled statements of fact as to compelled statements of opinion. As noted, the high court in *Riley* applied "exacting First Amendment scrutiny" to invalidate a state law requiring professional fundraisers, before or during any solicitation, to make a specific factual disclosure: the percentage of charitable collections actually remitted to charities over the past 12 months. (*Riley*, *supra*, 487 U.S. at p. 798.) Crucial to *Riley*'s analysis, however, was the high court's observation that the required disclosure was "inextricably intertwined with otherwise fully protected speech," namely, the advocacy and persuasive speech characteristic of charitable solicitations. (*Id.* at p. 796; see *Schaumburg v. Citizens for Better Environ.* (1980) 444 U.S. 620, 632 [charitable solicitations typically involve "persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues"].) The high court in *Riley* explained that "where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected speech." (*Riley*, at p. 796.) It was on that basis that *Riley* found applicable the principles governing "compelled speech . . . in the context of fully protected expression" established in cases like *Barnette*, *Wooley*, *Tornillo*, and *PG&E*. (*Riley*, at p. 797.) *Riley*'s conclusion that "[t]hese cases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact' " (*ibid.*) followed directly from the court's "refus[al] to separate the component parts of charitable solicitations from the fully protected whole" (*id.* at p. 796).

Unlike the disclosure requirement at issue in *Riley*, section 2527 involves a compelled statement of facts that is not temporally, tangibly, or otherwise linked to other

23

fully protected speech. *Riley* did not hold that such compelled speech is subject to heightened scrutiny. Indeed, the high court said that, "as a general rule," requiring professional fundraisers to make financial disclosures to the state, which the state may itself publish, would be unproblematic because compelled speech of that sort would avoid "burdening a speaker with unwanted speech *during the course of a solicitation*." (*Riley*, *supra*, 487 U.S. at p. 800, italics added.) Section 2527 does not require prescription drug claims processors to transmit the study reports to their clients during the course of negotiating reimbursement rates, renewing a contract, or processing claims. The statute does not require transmission of the study reports at any particular time or in any particular context, so long as it occurs every two years. (§ 2527, subd. (d).) Unlike the professional fundraisers in *Riley*, prescription drug claims processors can satisfy the statutory mandate independently of any other speech they wish to undertake. Although defendants object to being *compelled* to transmit the study reports to their clients, the fact of compulsion alone, which exists in equal measure when government requires a public disclosure (see *Riley*, at p. 800), is not sufficient to trigger the "exacting" scrutiny applied in *Riley* (*id.* at p. 798).

## B.

Although section 2527 does not implicate the core concerns that have motivated searching judicial scrutiny of compelled speech regulations, the Court of Appeal in *ARP Pharmacy* nonetheless concluded that section 2527 must be evaluated under strict scrutiny because it is a content-based regulation of noncommercial speech. (*ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc.*, *supra*, 138 Cal.App.4th at pp. 1315–1317 (*ARP Pharmacy*).) It is true that section 2527 "requires transmission of specific content" in a study report. (*ARP Pharmacy,* at p. 1315.) But the fact that "[n]othing about the content of this report proposes a commercial transaction between the speaker . . . and its audience" (*id.* at p. 1317) does not necessarily mean the report is not commercial speech. And although *ARP Pharmacy* said the study report "does not affect

24

the economic interests of the required speakers" (*ibid.*), we conclude otherwise, as explained below.

Section 2527 operates in a commercial setting; it prescribes a specific communication that a business entity must make to its clients. The prescribed communication is purely factual in nature, but it is information that defendants would rather not provide because, as they acknowledge, it could potentially affect prescription drug reimbursement rates. Although commercial speech is often described as "speech proposing a commercial transaction" (*Ohralik v. Ohio State Bar Assn.* (1978) 436 U.S. 447, 456 (*Ohralik*)), the high court has also referred to commercial speech more broadly as "expression related solely to the economic interests of the speaker and its audience" (*Central Hudson*, *supra*, 447 U.S. at p. 561). The study reports required by section 2527, though not proposing a commercial transaction, readily qualify as expression related to the economic interests of prescription drug claims processors and their clients. (See *Kasky*, *supra*, 27 Cal.4th at p. 963 [characterizing speech as commercial speech where it involved "a commercial speaker," "an intended commercial audience," and "representations of fact of a commercial nature"].) Further, as we observed in *Kasky*, one reason for drawing a constitutional distinction between commercial and noncommercial speech is that "governmental authority to regulate commercial transactions to prevent commercial harms justifies a power to regulate speech that is ' "linked inextricably" to those transactions.' " (*Kasky*, *supra*, 27 Cal.4th at p. 955, quoting *44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, 499 (*44 Liquormart*) (plur. opn.).) The communication required by section 2527 is linked inextricably to government-regulated health insurance transactions, further confirming its commercial nature.

Labeling the study reports "commercial speech," however, does not dispositively determine the level of judicial scrutiny applicable to section 2527. In *Gerawan II*, we held under article I that the proper standard for evaluating a compelled subsidy of generic advertising was intermediate scrutiny, but as noted, the marketing order there required a

25

commercial speaker to subsidize a public message with which it disagreed. (See *Gerawan II*, *supra*, 33 Cal.4th at p. 10.) We had no occasion in *Gerawan II* or in any subsequent case to consider a compelled speech regulation that requires a commercial speaker to privately transmit purely factual information containing no message with which it disagrees.

Just as we have consulted First Amendment doctrine to inform our determination of the boundary between commercial and noncommercial speech under article I (see *Kasky*, *supra*, 27 Cal.4th at pp. 959–962, 969), here we examine First Amendment case law to inform our determination of the level of scrutiny applicable to the compelled commercial speech in this case under article I. Although regulation of commercial speech is conventionally understood to trigger intermediate scrutiny under the First Amendment (*Central Hudson*, *supra*, 447 U.S. at p. 566), the United States Supreme Court has not automatically applied intermediate scrutiny to all regulations affecting commercial speech. This is perhaps unsurprising given the breadth and elasticity of what is commercial speech, as well as the diversity of regulations arising in the commercial setting. (See *Ohralik*, *supra*, 436 U.S. at p. 456 [commercial speech "occurs in an area traditionally subject to government regulation"].) As explained below, the principles that motivate the commercial speech doctrine lead us to conclude that section 2527 is properly analyzed under rational basis review, not intermediate scrutiny.

At the outset, we observe that the intermediate scrutiny standard for commercial speech arose in the context of *restrictions* on truthful, nonmisleading statements about products and services, and the high court has consistently applied intermediate scrutiny to *prohibitions* on such speech used for marketing or advertising. (See *Va. Pharmacy Board v. Va. Consumer Council* (1976) 425 U.S. 748, 761–770 (*Virginia Pharmacy Board*); *Central Hudson, supra*, 447 U.S. at pp. 563–566; *44 Liquormart*, 517 U.S. at pp. 501–504; *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 553–554; *Sorrell*, *supra*, 564 U.S. at pp. __–__ [131 S.Ct. at pp. 2667–2668].) In stating the rationale for

26

heightened scrutiny of laws restricting commercial speech, the high court has emphasized the importance of the "free flow of commercial information" (*Virginia Pharmacy Board*, at p. 765), "the informational function of advertising" (*Central Hudson*, at p. 563), and "consumer choice" (*44 Liquormart*, at p. 503). The commercial speech doctrine looks skeptically upon the paternalistic "assumption that the public will respond 'irrationally' to the truth." (*Ibid.*; see *Sorrell*, at p. ___ [131 S.Ct. at p. 2670] ["the fear that speech might persuade provides no lawful basis for quieting it"]; *Central Hudson*, at p. 562 ["In applying the First Amendment to this area, we have rejected the 'highly paternalistic' view that government has complete power to suppress or regulate commercial speech. '[P]eople will perceive their own best interests if only they are well enough informed, and . . . the best means to that end is to open the channels of communication, rather than to close them . . . .' [Citations.]"].)

Section 2527 does not impede the free flow of commercial information. It does not interfere with consumer choice, nor does it reflect paternalism toward participants in the marketplace. To the contrary, the Legislature enacted section 2527 in order to make available commercial information that was previously unavailable and potentially could not be provided by pharmacies because of antitrust constraints. (See *ante*, at pp. 5–6.) The statutorily specified consumers of the information — insurance companies, HMOs, and other third-party payors — are sophisticated business entities capable of acting on or ignoring the information as they see fit. If anything, section 2527 furthers the objectives of the commercial speech doctrine by enhancing the flow of information potentially relevant to commercial transactions among pharmacies, prescription drug claims processors, and third-party payors. In challenging section 2527, defendants here — unlike the complainants in cases that have invalidated laws *restricting* commercial speech — seek not to promote the free flow of commercial information for the benefit of the marketplace, but to vindicate their asserted right to provide their clients with only the information they wish to provide.

In evaluating regulations on commercial speech, the high court has distinguished between speech restrictions and compelled disclosures, and has adjusted its level of scrutiny accordingly. In *Zauderer v. Office of Disciplinary Counsel* (1985) 471 U.S. 626 (*Zauderer*), an Ohio attorney placed an advertisement in various newspapers offering to represent, on a contingent fee basis, women who had suffered injuries from using a contraceptive device. The Office of Disciplinary Counsel of the Supreme Court of Ohio filed a complaint against the attorney, alleging that the advertisement was deceptive and thus violated a state disciplinary rule because it failed to inform clients they would be liable for costs, as opposed to legal fees, even if their claims were unsuccessful. The attorney argued that Ohio's disciplinary rule violated the First Amendment by requiring him to include information in his advertisement that he did not wish to include. The high court disagreed, explaining that the attorney's arguments "overlook[ed] material differences between disclosure requirements and outright prohibitions on speech." (*Id.* at p. 650.) "In requiring attorneys who advertise their willingness to represent clients on a contingent-fee basis to state that the client may have to bear certain expenses even if he loses," the high court reasoned, "Ohio has not attempted to prevent attorneys from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present." (*Ibid.*) The First Amendment interests implicated by Ohio's disclosure requirement were therefore "substantially weaker than those at stake when speech is actually suppressed." (*Id.* at p. 651, fn. 14.)

Declining to apply either the strict scrutiny applicable to compelled political speech or the intermediate scrutiny applicable to prohibitions on commercial speech, the high court in *Zauderer* explained: "Ohio has not attempted to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.' [(*Barnette*, *supra*, 319 U.S. at p. 642.)] The State has attempted only to prescribe what shall be orthodox in commercial advertising,

and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available.  Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, see [(*Virginia Pharmacy Board*, *supra*, 425 U.S. 748)], appellant's constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal.  Thus, in virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, 'warning[s] or disclaimer[s] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception.' "  (*Zauderer*, *supra*, 471 U.S. at p. 651.)

The *Zauderer* court concluded:  "We do not suggest that disclosure requirements do not implicate the advertiser's First Amendment rights at all.  We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech.  But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."  (*Zauderer*, *supra*, 471 U.S. at p. 651.)  Noting that "restraints on commercial speech" are subject to " 'least restrictive means' analysis" under *Central Hudson*'s intermediate scrutiny standard, the high court made clear that the level of scrutiny applicable to disclosure requirements is less rigorous:  "we do not think it appropriate to strike down such requirements merely because other possible means by which the State might achieve its purposes can be hypothesized" or because a disclosure requirement "is 'underinclusive' — that is, . . . it does not get at all facets of the problem it is designed to ameliorate."  (*Zauderer*, at p. 651, fn. 14.)  The Ohio disciplinary rule, the court held, "easily passes muster" under the rational basis standard.  (*Id.* at p. 652.)

*Zauderer* is not directly analogous to the present case because the record before us does not indicate that the purpose or effect of section 2527 is to prevent deception or misleading statements. But we find persuasive the distinction the high court drew "between disclosure requirements and outright prohibitions on speech" (*Zauderer*, *supra*, 471 U.S. at p. 650), and we agree that the free speech interests implicated by compelled disclosure of "purely factual and uncontroversial information" are "substantially weaker than those at stake when speech is actually suppressed" (*id.* at p. 651 & fn. 14). Moreover, although *Zauderer* addressed a disclosure requirement designed to prevent deception, the plurality opinion in *44 Liquormart* subsequently explained that not "*all* commercial speech regulations are subject to a similar form of constitutional review simply because they target a similar category of expression. . . . [¶] When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, *or requires the disclosure of beneficial consumer information*, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech" and thus justifies the application of judicial review less strict than the standard applicable to suppression of commercial speech. (*44 Liquormart*, *supra*, 517 U.S. at p. 501, second italics added.)

We find the reasoning above to be sound: Laws requiring a commercial speaker to make purely factual disclosures related to its business affairs, whether to prevent deception or simply to promote informational transparency, have a "purpose . . . consistent with the reasons for according constitutional protection to commercial speech." (*44 Liquormart*, *supra*, 517 U.S. at p. 501.) Because such laws facilitate rather than impede the "free flow of commercial information" (*Virginia Pharmacy Board*, *supra*, 425 U.S. at p. 765), they do not warrant intermediate scrutiny. Instead, we hold that rational basis review is the proper standard for evaluating such laws under California's free speech clause.

30

## C.

Justice Corrigan says we cite "no *California* case applying rational basis review to a law implicating free speech under our Constitution." (Conc. & dis. opn., *post*, at p. 2.) But that simply reflects "[t]he absence, over many years, of free speech challenges" to the "hundreds of [California] statutory provisions and regulations . . . enacted or adopted in a great variety of contexts that require individuals or entities to ascertain and disclose factual information that the individual or entity might otherwise choose not to disclose." (Conc. opn., *post*, at pp. 3–4.) Apparently there is a first time for everything, including this novel claim under California's free speech clause.

Although the issue is one of first impression for us, our holding today is consistent with the reasoning of numerous courts that have applied rational basis review to disclosure requirements that serve to better inform a commercial audience, whether or not also intended to prevent deception. In *National Electrical Manufacturers Assn. v. Sorrell* (2d Cir. 2001) 272 F.3d 104 (*National Electrical*), the Second Circuit considered a First Amendment challenge to a Vermont statute requiring manufacturers of mercury-containing products to label their products and packaging to inform consumers that the products contain mercury. A manufacturers association argued that the statute " ' "indisputably require[d] them to speak when they would rather not." ' " (*Id.* at p. 113.) In rejecting this claim, the Second Circuit explained that "within the class of regulations affecting commercial speech, there are 'material differences between [purely factual and uncontroversial] disclosure requirements and outright prohibitions on speech.' [(*Zauderer*, *supra*, 471 U.S. at p. 650.)] . . . [¶] . . . [M]andated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests. Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of ideas.' Protection of the robust and free flow of accurate information is the principal First Amendment

31

justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal." (*National Electrical,* at pp. 113–114.) "Additionally, the individual liberty interests guarded by the First Amendment, which may be impaired when personal or political speech is mandated by the state, [citation], are not ordinarily implicated by compelled commercial disclosure, [citation]. Required disclosure of accurate, factual commercial information presents little risk that the state is forcing speakers to adopt disagreeable state-sanctioned positions, suppressing dissent, confounding the speaker's attempts to participate in self-governance, or interfering with an individual's right to define and express his or her own personality." (*Id.* at p. 114.)

Applying rational basis review, the Second Circuit held that the required labeling of mercury-containing products did not violate the First Amendment. "Vermont's interest in protecting human health and the environment from mercury poisoning is a legitimate and significant public goal," the court held. (*National Electrical*, *supra*, 272 F.3d at p. 115.) Although the compelled disclosure "was not intended to prevent 'consumer confusion or deception' per se," it was "rationally related to the state's goal of reducing mercury contamination" because it would increase consumer awareness of the need to properly dispose of mercury-containing products. (*Ibid.*) The court distinguished its prior holding in *International Dairy Foods Assn. v. Amestoy* (2d Cir. 1996) 92 F.3d 67 (*Amestoy*), which applied intermediate scrutiny to a Vermont law that required labeling of products from cows treated with growth hormone. In that case, the *National Electrical* court explained, the "state disclosure requirement [was] supported by no interest other than the gratification of 'consumer curiosity.' " (*National Electrical*, at p. 115, fn. 6, quoting *Amestoy*, at p. 73; cf. *Amestoy*, at p. 81 (dis. opn. of Leval, J.) [*Zauderer* and *44 Liquormart* send "a clear message" that "[t]he benefit the First Amendment confers in the area of commercial speech is the provision of accurate, non-misleading, relevant information to consumers. Thus, regulations designed to prevent the flow of such information are disfavored; regulations designed to provide such information are not."].)

The Second Circuit reaffirmed its reasoning in *National Electrical* eight years later in *New York State Restaurant Assn. v. New York City Board of Health* (2009) 556 F.3d 114, which rejected a First Amendment challenge to a city regulation requiring restaurants to post calorie content information on their menus.  The court again held that rational basis review applies to factual disclosure requirements designed to inform consumers, whether or not also designed to prevent deception.  (See *id.* at pp. 132–133 [neither *Zauderer* nor subsequent authority limits rational basis review only to disclosures designed to prevent deception].)

The District of Columbia Circuit similarly applied rational basis review to uphold the disclosures required by section 13(f) of the Securities and Exchange Act of 1934 against a First Amendment challenge.  (See *Full Value Advisors, LLC v. S.E.C.* (D.C. Cir. 2011) 633 F.3d 1101 (*Full Value*).)  The statute mandates that "institutional investment managers such as Full Value file quarterly reports — a 'Form 13F Report' — with the [Securities and Exchange] Commission, disclosing, among other things, the names, shares, and fair market value of the securities over which the institutional managers exercise control."  (*Id.* at p. 1104.)  Unless one of two statutory exemptions applies, the Securities and Exchange Commission must make the Form 13F Report publicly available.  (*Id.* at pp. 1104–1105.)  Managers seeking an exemption "must submit enough information on Form 13F for the Commission to make an informed judgment as to the merits of the request."  (*Id.* at p. 1105.)

The plaintiff argued that "its inability to control what the Commission does with investment information divulged in the course of an application for confidential treatment or an exemption request [was] a form of compelled speech."  (*Full Value*, *supra*, 633 F.3d at p. 1108.)  While acknowledging that "[t]he freedom of thought protected by the First Amendment against state action 'includes both the right to speak freely and the right to refrain from speaking at all' " (*ibid.*, quoting *Wooley*, *supra*, 430 U.S. at p. 714), the court concluded that the required disclosures did not raise serious constitutional concerns:

33

"Here the Commission — not the public — is Full Value's only audience. The Act is an effort to regulate complex securities markets, inspire confidence in those markets, and protect proprietary information in the process. It is not a veiled attempt to 'suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.' [Citation.]" (*Full Value*, at p. 1108.) The court likened the disclosure to the mandatory "submi[ssion] of income tax information to the IRS" (*ibid.*) and upheld the disclosure as "a rational means of achieving" Congress's goal (*id.* at p. 1109, citing *Zauderer*, *supra*, 471 U.S. at p. 651).

The Ninth Circuit took a similar approach in upholding a federal Clean Water Act regulation that requires municipal separate storm sewer systems (MS4s) "to 'distribute educational materials to the community . . . about the impacts of stormwater discharges on water bodies and the steps the public can take to reduce pollutants in stormwater runoff' " and "to '[i]nform public employees, businesses, and the general public of hazards associated with illegal discharges and improper disposal of waste.' " (*Environmental Defense Center, Inc. v. U.S. E.P.A.* (9th Cir. 2003) 344 F.3d 832, 848 (*Environmental Defense*).) The petitioners argued that the rule violated the First Amendment because it compels "small MS4s to communicate messages that they might not otherwise wish to deliver." (*Ibid.*)

The Ninth Circuit disagreed: "We conclude that the purpose of the challenged provisions is legitimate and consistent with the regulatory goals of the overall scheme of the Clean Water Act, [citation], and does not offend the First Amendment. The State may not constitutionally require an individual to disseminate an ideological message, [citation], but requiring a provider of storm sewers that discharge into national waters to educate the public about the impacts of stormwater discharge on water bodies and to inform affected parties, including the public, about the hazards of improper waste disposal falls short of compelling such speech." (*Environmental Defense*, *supra*, 344 F.3d at p. 849, fn. omitted.) Relying on *Zauderer*, the court contrasted the public

34

education requirement with the compelled speech in *Barnette* and *Wooley*, and said that "[i]nforming the public about safe toxin disposal is non-ideological; it involves no 'compelled recitation of a message' and no 'affirmation of belief.' [Citation.]" (*Environmental Defense*, at pp. 849–850.) The court further observed that the rule did not "prohibit the MS4 from stating its own views about the proper means of managing toxic materials, or even about the [rule] itself. Nor is the MS4 prevented from identifying its dissemination of public information as required by federal law, or from making available federally produced informational materials on the subject and identifying them as such." (*Id.* at p. 850.)

Another example is *Pharmaceutical Care Management Assn. v. Rowe* (1st Cir. 2005) 429 F.3d 294 (*Rowe*), where a national association of pharmacy benefit managers (PBMs) claimed that Maine's Unfair Prescription Drug Practices Act violated the First Amendment by requiring PBMs to disclose information about various financial arrangements and conflicts of interest. Maine enacted the law because PBMs, in their role as intermediaries, "have the opportunity to engage in activities that may benefit the drug manufacturers and PBMs financially to the detriment of the health benefit providers," and a health benefit provider may have "no idea that a PBM may not be working in its interest." (*Rowe*, at p. 298.) The First Circuit determined that the compelled disclosure "does indeed implicate the First Amendment" and that the disclosure was " 'expression related solely to the economic interests of the speaker and its audience' " and thus qualified as commercial speech. (*Id.* at p. 309.) Then, applying *Zauderer*, the court found the law reasonably related to the state's interest not only in "preventing deception of consumers" but also in "increasing public access to prescription drugs" by " 'creat[ing] incentives within the market for the abandonment of certain practices that are likely to unnecessarily increase cost without providing any corresponding benefit to the individual whose prescription is being filled and that appear

35

to be designed merely to improve a drug manufacturer's market share.' " (*Rowe*, at p. 310, quoting district court opinion.)

In a concurring opinion, Chief Judge Boudin said, "What is at stake here . . . is simply routine disclosure of economically significant information designed to forward ordinary regulatory purposes — in this case, protecting covered entities from questionable PBM business practices.  There are literally thousands of similar regulations on the books — such as product labeling laws, environmental spill reporting, accident reports by common carriers, SEC reporting as to corporate losses and (most obviously) the requirement to file tax returns to government units who use the information to the obvious disadvantage of the taxpayer.  [¶] The idea that these thousands of routine regulations require an extensive First Amendment analysis is mistaken." (*Rowe*, *supra*, 429 F.3d at p. 316 (conc. opn. of Boudin, C.J.).)

We find the authorities above persuasive.  The same reasons that federal appellate courts have given for applying rational basis review under the First Amendment to laws like section 2527 apply with equal force to our interpretation of article I's free speech clause.  Basic principles of judicial restraint counsel against making the free speech clause into a warrant for courts to superintend the Legislature's economic policy judgments.  Yet that is the risk we would run if we were to make heightened scrutiny applicable to factual disclosure requirements in the commercial context, for such requirements are as ubiquitous in the California Codes as they are in federal law.  (See, e.g., Pub. Resources Code, § 21000 et seq. [Cal. Environmental Quality Act requires disclosures to inform the public about environmental effects of proposed projects]; Pub. Resources Code, § 14549, subd. (a) [requiring every glass container manufacturer to report monthly the total tons of new glass food, drink, and beverage containers made in California]; Health & Saf. Code, § 38530 [authorizing regulations to require greenhouse gas emission sources to monitor and report greenhouse gas emissions]; Health & Saf. Code, § 1339.56, subd. (a) [requiring hospitals to annually compile and disclose a list of

25 common outpatient procedures and average charges for those procedures]; Health & Saf. Code, § 1385.03, subd. (a)(1) [requiring health care service plans to disclose rate information for individual and small group contracts at least 60 days before implementing any rate change]; Civ. Code, § 1785.10, subd. (b) [requiring consumer reporting agencies, upon contact by a consumer, to advise the consumer of statutory rights]; Civ. Code, § 1812.509, subd. (b) [requiring employment agencies to notify a jobseeker whether a labor contract exists and whether union membership is required at the establishment to which the jobseeker is being sent]; Civ. Code, § 1714.43, subd. (a)(1) [requiring every retail seller and manufacturer doing business in California with worldwide gross receipts over $100 million to disclose its efforts to eradicate slavery and human trafficking from its direct supply chain].)

Like section 2527, the statutes above and many others do not require regulated entities to adopt or support any viewpoint or opinion. They are not designed to inform or prescribe any specific business or policy outcome, nor are they predicated on any particularized interest in preventing deception or confusion. They simply require disclosure of factual information in order to inform private or public decisionmaking in the economic or political marketplace. We may assume that the regulated entities would prefer not to make these disclosures, many of which run counter to their business interests. But the Legislature has determined that the information should be made available in order to promote informed choice in the free market and in the development of sound public policy.

Defendants contend that section 2527 aims merely to alter a private contractual relationship and thus differs from disclosure laws having clear public welfare, safety, or consumer protection objectives. But there is no question that laws requiring nutrition labeling, energy labeling, or calorie disclosures, among others, also aim to alter private contractual relationships by making available what legislatures believe to be salient information for market participants to consider. At the same time, it is inaccurate to say

37

that the only objective of section 2527 is to alter a private contractual relationship. As the court in *ARP Pharmacy* observed: "The legislative history suggests that the governmental purpose in enacting section 2527 was to urge third party payors, by the use of statistical information, to compensate pharmacists at a fairer rate for providing pharmaceutical services to their insureds. While increased payment would benefit pharmacists, it also would potentially benefit insured consumers. The theory was that if insurers paid the pharmacies dispensing fees closer to the amount paid by uninsured consumers, pharmacies would be more likely to continue to contract with insurers, and insured consumers would be able to have their prescriptions filled at the pharmacies of their choice." (*ARP Pharmacy*, *supra*, 138 Cal.App.4th at p. 1320.) Like myriad laws requiring informational disclosures in private transactions, section 2527 is easily described as having a public purpose. And the public purpose is not qualitatively different from the "public health" purpose of other disclosure laws that do not trigger heightened scrutiny. (Conc. & dis. opn., *post*, at pp. 10, 14.)

Justice Corrigan contends that "[w]hether one large, sophisticated corporate entity provides such information to a similarly sophisticated entity within the context of a private agreement should be a matter left to negotiation between them, just like any other provision of a contract between corporations. . . . Simply put, the government has taken sides, resorting to compelled speech to promote its vision of what this private contract should look like." (Conc. & dis. opn., *post*, at p. 12.) Justice Corrigan says this is "paternalism writ large" (*id.* at p. 15), even as she urges this court to erect a constitutional shield to protect sophisticated business entities from a state-mandated report that they are entirely free to ignore.

The reality is that section 2527 is not "a unique and unprecedented statute" that "is nothing like any other disclosure statute." (Conc. & dis. opn., *post*, at p. 14.) Disclosure requirements are commonplace even for commercial transactions between sophisticated business entities, and all such laws reflect legislative judgments as to what information

38

should be available for market participants to consider when negotiating or agreeing to a contract, even when one party "could easily contract to secure that information" from the other party. (*Ibid.*; see, e.g., Pub. Resources Code, § 25402.10, subd. (d)(1) [requiring owners and operators of nonresidential buildings to disclose data on energy consumption "to a prospective buyer, lessee of the entire building, or lender that would finance the entire building"]; Health & Saf. Code, § 25359.7, subd. (a) [requiring owners of nonresidential real property to give written notice to buyers, lessors, or renters regarding the presence of hazardous substances]; Civ. Code, § 1101.5, subd. (e) [requiring sellers of commercial real property, starting in 2019, to disclose in writing to prospective purchasers the statutory requirement to replace noncompliant plumbing fixtures with water-conserving fixtures and "whether the property includes any noncompliant plumbing fixtures"]; Civ. Code, § 1938 [requiring commercial property owners and lessors to state on every lease form or rental agreement whether the property meets applicable standards for making new construction and existing facilities accessible to persons with disabilities].) If such laws are held to trigger heightened scrutiny because of their "paternalism" toward private actors despite the legitimate public interests they are intended to serve, then our courts will be very busy indeed.

To hold that section 2527 and countless similar laws must be subject to heightened scrutiny, including least restrictive means analysis (*Central Hudson*, *supra*, 447 U.S. at pp. 564–565), would open the door to intrusive and persistent judicial second-guessing of legislative choices in the economic sphere. "Such a result is neither wise nor constitutionally required." (*National Electrical*, *supra*, 272 F.3d at p. 116.) History casts doubt on the notion that courts applying heightened scrutiny can sort out which disclosure requirements are sufficiently well justified and which are not — or which requirements "tip the scale" and which merely "level the playing field" between market actors (conc. & dis. opn., *post*, at pp. 11, 12) — without serious risk of constitutionalizing the economic theories or policy views of individual judges. (See *Lochner v. New York*

39

(1905) 198 U.S. 45, 75–76 (dis. opn. of Holmes, J.).) Just as we have long repudiated judicial second-guessing of legislative judgments concerning economic means and ends under principles of due process of law (see *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 278), we see no basis to resurrect such an approach and improperly aggrandize the power of courts at the expense of the Legislature under state constitutional principles of free speech.

Our holding today does not "all but eviscerate the commercial speech protections of article I." (Conc. & dis. opn., *post*, at p. 14.) Laws that restrict commercial speech remain subject to heightened scrutiny, as do laws that compel a commercial speaker to adopt, endorse, or subsidize a message or viewpoint with which it disagrees. (See *Gerawan II*, *supra*, 33 Cal.4th at p. 10.) Further, there is nothing " 'incongruous' " (conc. & dis. opn., *post*, at p. 5) about holding that section 2527 implicates the right to free speech under article I while also holding that section 2527 is subject to deferential judicial review. This approach parallels the settled understanding of due process and equal protection principles as applied to economic regulations. To say that the Legislature has broad discretion to enact economic regulations is not to say that the Legislature may, willy-nilly, impose burdens on private persons or entities. The exercise of legislative power must not be arbitrary, irrational, or motivated by a bare desire to harm a particular class; the Legislature must always act within constitutional bounds. However, the boundaries with respect to the Legislature's prerogative to require factual disclosures in the commercial setting are necessarily broad. Were it otherwise, the constitutional claims of litigants seeking to avoid duly enacted reporting or disclosure obligations would routinely invite judges to substitute their policy judgments for those of the people's representatives.

**D.**

Under rational basis review, a statute "comes to us bearing a strong presumption of validity." (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 314.) "So long

as the challenged [regulation] 'bear[s] some rational relationship to a conceivable legitimate state purpose' [citations], it will pass muster; once we identify ' " 'plausible reasons' for [the regulation] 'our inquiry is at an end' " ' [citation]." (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 209.)

Defendants do not contend that section 2527 is invalid under rational basis review, and for good reason. The Legislature enacted section 2527 to make certain information on pharmacy fees available to participants in private negotiations over prescription drug reimbursement rates and for potential use in legislative or regulatory forums. The biennial transmittal of study reports on pharmacy fees from prescription drug claims processors to their clients is reasonably related to the legitimate purpose of promoting informed decisionmaking about prescription drug reimbursement rates. Like calorie content information on restaurant menus, nutritional labels on packaged foods, energy labels on home appliances, information about stormwater discharge impacts, and many other required disclosures, the study reports required by section 2527 contribute to the free flow of information in the economic and political marketplace. Accordingly, section 2527 passes rational basis review.

## CONCLUSION

For the reasons above, we answer the Ninth Circuit's question as follows: Section 2527 is subject to rational basis review under California's free speech guarantee (Cal. Const., art. I, § 2, subd. (a)) and satisfies that standard because it is reasonably related to a legitimate policy objective. We disapprove *ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc.*, *supra*, 138 Cal.App.4th 1307, to the extent it applied strict scrutiny to hold that section 2527 violates the free speech rights of prescription drug claims processors under the California Constitution.

LIU, J.


WE CONCUR:  KENNARD, J.
      BAXTER, J.
      WERDEGAR, J.

42

**CONCURRING OPINION BY CANTIL-SAKAUYE, C. J.**


I concur fully in the majority opinion's conclusion that Civil Code section 2527 (section 2527) does not violate the state constitutional right of free speech embodied in article I, section 2 of the California Constitution (article I, section 2). Unlike the majority, however, I would base that determination on the ground that the provisions of section 2527 do not even implicate the protections afforded by the state constitutional free speech clause.

In finding that section 2527 implicates the state free speech clause, the majority relies heavily on a passage from this court's opinion in *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 491 (*Gerawan I*) that indicates that a statute that requires the disclosure of factual information an individual or entity would otherwise not choose to disclose implicates the right to freedom of speech protected by article I, section 2. In my view, however, the relied-upon language in *Gerawan I* — which was not necessary to the holding in that case — is overbroad and misleading insofar as it suggests that the state constitutional right of free speech encompasses not only a right to speak but also a parallel and coextensive right not to speak. I would take this opportunity to clarify and narrow the language in question. As explained, I believe it is more faithful to both the language and historic understanding of the California free speech clause to hold that section 2527 and similar statutory provisions requiring the disclosure of factual information do

1

not implicate (or, in other words, do not fall within the reach of) the state constitutional free speech clause.

As the majority opinion recognizes, article I, section 2 provides in relevant part: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Art. I, § 2, subd. (a).) By its terms, article I, section 2 declares the right protected by this constitutional provision is the right to "freely speak, write and publish his or her sentiments on all subjects." On its face, the provision does not purport to afford a constitutional right to refuse to disclose information.

I acknowledge that there are unquestionably circumstances in which a statute that compels speech will implicate the protections of article I, section 2 — for example, when a statute requires an individual to pledge allegiance to or express belief in a political, ideological, or philosophical position with which he or she disagrees, or when the compelled disclosure is so intertwined with protected speech that it is likely to chill such protected speech. In my view, however, it is not accurate to state that, *as a general matter*, article I, section 2 was intended, or should be interpreted, to afford a broad constitutional right to withhold information. There are other state constitutional provisions that are ordinarily associated with a right of nondisclosure — the privilege against self-incrimination and the right of privacy, for example — but it strains credulity to suggest that an individual who refuses to provide factual information when questioned at trial or at a legislative hearing or who declines to provide information required on a tax return or in order to obtain a permit is, by such refusal, exercising his or her *right of free speech*. As the earliest California cases applying the state constitutional free speech clause make clear, "[t]he purpose of this provision of the constitution was the abolishment of censorship" (*Daily v. Superior Court* (1896) 112 Cal. 94, 97; see also *In re*

2

*Shortridge* (1893) 99 Cal. 526, 533-535), *not* to establish a fundamental constitutional right to decline to provide information.

As noted, the source of the majority's contrary conclusion lies in a passage contained in *Gerawan I*, *supra*, 24 Cal.4th 468, that states: "Article I's right to freedom of speech, like the First Amendment's, is implicated in speaking itself. Because speech results from what a speaker chooses to say and what he chooses not to say, *the right in question comprises both a right to speak freely and also a right to refrain from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say.*" (*Id.* at p. 491, italics added.) In my view, the emphasized language is overbroad and misleading insofar as it suggests that, as a general matter, the state constitutional right of free speech encompasses not only a right to speak but a parallel and coextensive right not to speak.

In the past, article I, section 2 has been interpreted expansively to protect the right to speak freely (see, e.g., *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908-911; *Daily v. Superior Court*, *supra*, 112 Cal. at pp. 97-99), but the state free speech clause has not historically been understood or interpreted as affording a parallel broad constitutional right "not to speak" when an individual or entity is required by a statute or regulation to disclose factual information. Throughout California's history, hundreds of statutory provisions and regulations have been enacted or adopted in a great variety of contexts that require individuals or entities to ascertain and disclose factual information that the individual or entity might otherwise choose not to disclose. For example, disclosure of a significant amount of information is required whenever an individual or entity seeks to obtain a permit or license (see, e.g., Bus. & Prof. Code, § 10151), attain admission to a public university (see, e.g., Code Cal. Reg., tit. 5, § 40753), or qualify for a tax

exemption or other public benefit (see, e.g., Rev. & Tax. Code, § 17131 et seq.); a refusal to disclose such required information has never been viewed as the exercise of the right of free speech. Similarly, statutes and regulations routinely require disclosure of, for example, the ingredients and nutritional value of packaged food (see, e.g., Health & Saf. Code, § 110100), the total interest and fees applicable to a credit card or loan (Civ. Code §§ 1748.10-1748.14, 1748.20-1748.23, 1917.712; Bus. & Prof. Code, § 10240 et seq.), the presence of potentially carcinogenic chemicals on business premises (Health & Saf. Code, § 25249.6 et seq. [Prop. 65]), the condition of real property upon sale of the property (Civ. Code, § 1102 et seq.), any breach of security experienced by a business maintaining computerized personal information data (Civ. Code, §§ 1798.29, 1798.82), or the nature and investment risk of any insurance product or annuity (Ins. Code, § 762). (See also, maj. opn., *ante*, at p. 36 [listing additional California disclosure statutes].) Although such widespread statutory and regulatory disclosure requirements have sometimes been challenged on other constitutional grounds — for example, as violating the right of privacy, due process, or equal protection (see, e.g., *Hays v. Wood* (1979) 25 Cal.3d 772, 783, 786-795; *Fendrich v. Van de Kamp* (1986) 182 Cal.App.3d 246, 258-264; *Gerling Global Reinsurance Corp. v. Low* (9th Cir. 2002) 296 F.3d 832, 844-848, 851) — such requirements have not been viewed as implicating the state constitutional right of free speech and historically have not been challenged on that ground. The absence, over many years, of free speech challenges to the numerous California disclosure statutes and regulations speaks volumes regarding the well understood meaning of the state constitutional free speech guarantee.

This is not to say that there are no instances in which a statute that compels speech will implicate the interests that the state free speech clause is intended to protect and will therefore properly be analyzed under the principles generally

4

applicable to other free speech claims. For example, a statute that requires an individual to express belief in an ideological or philosophical precept with which the individual disagrees (cf., e.g., *Board of Education v. Barnette* (1943) 319 U.S. 624, 631-642 [compulsory flag salute and pledge of allegiance]), or that requires a commercial entity to financially subsidize a promotional advertisement that the entity does not endorse and that is drafted by the entity's competitors (*Gerawan I*, *supra*, 24 Cal.4th at pp. 510-511 [required subsidizing of generic plum marketing campaign]), are properly found to implicate the interests protected by the free speech clause. Similarly, a statute that requires the disclosure of information under circumstances that realistically pose a chilling effect on the exercise of constitutionally protected speech is also properly subject to evaluation under constitutional free speech principles. (Cf., e.g., *N.A.A.C.P. v. Alabama* (1958) 357 U.S. 449, 460-463 [disclosure of membership list of controversial political organization].)

But I believe it is not accurate to maintain, as the language in *Gerawan I* suggests, that *every* statute that requires an individual or entity to disclose factual information that the individual or entity would not otherwise disclose falls within the bounds of the state free speech clause. Instead, because the overwhelming majority of statutes or regulations that require an individual or entity to ascertain and disclose factual information do not threaten or otherwise put at risk the protection that the state free speech clause was intended to provide, I believe that a statute that simply requires the ascertainment and disclosure of factual information should be viewed, presumptively, as not implicating the state constitutional free speech clause. Only when there are special circumstances indicating that the required disclosure potentially threatens an interest that the free speech clause was intended to protect should the statute be scrutinized under the free speech guarantee embodied in article I, section 2.

5

If a statute such as section 2527 is viewed as falling within the reach of the state free speech clause, I would agree with the majority's conclusion that the validity of the statute would properly be evaluated under the deferential rational basis standard. In my view, however, it is not only more faithful to the language and history of article I, section 2, but also more analytically coherent to conclude that the state free speech clause is not implicated when a statute requiring disclosure of factual information does not threaten any of the interests that the free speech clause was intended to protect, rather than to conclude, as the majority does, that such a statute implicates the free speech clause but is nonetheless subject to no greater scrutiny than if the statute did not implicate the right of free speech.

**CANTIL-SAKAUYE, C. J.**

6

**CONCURRING AND DISSENTING OPINION BY CORRIGAN, J.**

I agree with the majority that Civil Code section 2527 (hereafter section 2527, the statute, or the provision) implicates the right of free speech under article I, section 2, subdivision (a) of our state Constitution (article I), which provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." As we explained in *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468 (*Gerawan I*), "the right in question comprises both a right to speak freely and also a right to refrain from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say." (*Id.* at p. 491.) In light of the history and broad language of article I, "[t]he reference to 'all subjects' obviously included commercial speech . . . ." (*Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1, 15 (*Gerawan II*).) Even in the First Amendment context, the United States Supreme Court has held "that the creation and dissemination of information are speech" within the meaning of that provision. (*Sorrell v. IMS Health Inc.* (2011) __ U.S. __ [131 S.Ct. 2653, 2667].) Under our precedent, forcing someone to speak implicates the free speech right under article I, even in a commercial context. By compelling preparation and dissemination of a report about pricing, the statute implicates the state constitutional right *not* to speak under compulsion.

1

My disagreement with the majority concerns the appropriate standard of review, which is more than simply a dry legal formalism. When the government seeks to prohibit or compel speech, the standard of review is an important safeguard. It requires the government to justify, to varying degrees of rigor, why it should be permitted to do so. In my view, the majority sets the bar for this safeguard too low. There are, broadly, three potential standards: strict scrutiny, intermediate scrutiny, and, least protective, a rational basis justification.

Although recognizing that our state free speech right is implicated, the majority selects a rational basis standard of review. But that standard is generally applicable when a statute does *not* implicate free speech. The majority reasons: "Laws requiring a commercial speaker to make purely factual disclosures related to its business affairs, whether to prevent deception *or simply to promote informational transparency*, have a 'purpose . . . consistent with the reasons for according constitutional protection to commercial speech.' [Citation.] Because such laws facilitate rather than impede the 'free flow of commercial information' [citation], they do not warrant intermediate scrutiny." (Maj. opn., *ante*, at p. 30, italics added.) This reasoning is flawed. It is also inconsistent with the history of article I and our cases construing that provision.

At the outset, it is important to be clear as to our task. We are interpreting a provision of the *California* Constitution that has governed free speech in this state since its inception. We are not bound, in this regard, by United States Supreme Court or lower federal court rulings that interpret the federal constitutional provision. In deciding this case, we are adopting as a matter of California law and policy, the restrictions to be placed on the government when it seeks to control how its citizens speak or remain silent during the conduct of their own affairs.

2

Initially, the majority cites no *California* case applying rational basis review to a law implicating free speech under our Constitution. It relies instead on various federal authorities. However, in determining the proper standard of review, we must first examine our *Gerawan* cases, which addressed both the protections afforded commercial speech and the relevant standard of review. There, we considered the constitutionality of a government marketing program that required plum growers to fund generic advertising for plums. We acknowledged in *Gerawan I* that the United States Supreme Court in *Glickman v. Wileman Brothers & Elliott, Inc.* (1997) 521 U.S. 457, had held that a similar program did not implicate the First Amendment's free speech clause. However, we declined to follow *Glickman*'s reasoning in construing our own state's protection of free speech. We initially observed that article I's free speech clause did not derive from the First Amendment and is generally broader than that provision. (*Gerawan I, supra,* 24 Cal.4th at pp. 489-493; *Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 366, fn. 9.)

*Gerawan I* explained that the state free speech provision, from its inception, protected commercial speech, many decades before the United States Supreme Court recognized any commercial speech right in the First Amendment. This was due both to the breadth of its language, providing a right to speak freely "on all subjects," and the history of its origins. (Art. I.) *Gerawan I* observed that, at the time of the founding of our state, both American legislatures and courts had a history of keeping commercial speech free of regulation, except in cases of unlawful activity or to curb fraud or misleading statements. (*Gerawan I, supra,* 24 Cal.4th at p. 494.) *Gerawan I* described this period in our history: "In California itself in 1849, the prevailing political, legal, and social culture was that of Jacksonian democracy. [Citations.] Jacksonian democracy was animated by 'ideals of equality and open opportunity.' [Citation.] Those ideals worked

3

themselves out in a 'liberal, market-oriented, economic individualism.' [Citation.] What such individualism presupposed, and produced, was wide and unrestrained speech about economic matters generally, including, obviously, commercial affairs." (*Id.* at p. 495.)

Protection of economic speech is not absolute. "[A]rticle I's right to freedom of speech allows compelling one who engages in commercial speech to say through advertising what he otherwise would not say, even about a lawful product or service, in order to render his message truthful and not misleading." (*Gerawan I, supra,* 24 Cal.4th at p. 509.) However, *Gerawan I* concluded that the marketing program at issue compelled funding of "generic advertising that is intended not to prevent or correct any otherwise false or misleading message in the interest of consumer protection, but solely to develop markets and promote sales in the interest of producer welfare." (*Id.* at p. 510.) We remanded the matter to the Court of Appeal, leaving undetermined the proper standard of review. (*Id.* at p. 517.)

We addressed that issue in *Gerawan II* and concluded the proper standard was "the intermediate scrutiny standard articulated by the United States Supreme Court in *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557." (*Gerawan II, supra,* 33 Cal.4th at p. 6.) We observed that "[i]n light of our recognition in *Gerawan I* that the generic advertising program does in fact implicate the free speech clause, . . . we believe it would be incongruous to subject the program to only minimal scrutiny." (*Id.* at p. 21.) Finding persuasive Justice Souter's dissenting opinion in *Glickman,* we stated "the conclusion of the *Glickman* majority that the compelled funding of generic advertising requires only minimal scrutiny is at variance with the general rule that intrusion into free speech rights requires substantial justification, even when the intrusion is incidental to the enforcement of a content-neutral law. [Citation.] The requirement of substantial

4

justification is further supported by the fact that the right to free speech under the California Constitution is in some respects ' "broader" and "greater" ' than under the First Amendment. [Citation to *Gerawan I*]." (*Ibid.*) "Because generic advertising was not self-evidently incidental to the functioning of some important, legislatively established institution, such as a union shop or an integrated state bar as in *Abood* [*v. Detroit Board of Education* (1977) 431 U.S. 209] and *Keller* [*v. State Bar of California* (1990) 496 U.S. 1], Justice Souter argued for treating compelled funding of such advertising the same as any other regulation implicating the right of commercial speech, subjecting it to the test articulated in *Central Hudson . . . .* That standard asks (1) 'whether the expression is protected by the First Amendment,' which means that the expression 'at least must concern lawful activity and not be misleading'; (2) 'whether the asserted governmental interest is substantial'; if yes to both, then (3) 'whether the regulation directly advances the governmental interest asserted'; and (4) 'whether it is not more extensive than is necessary to serve that interest.' " (*Id.* at p. 22.) *Gerawan II* also noted that "the right Gerawan seeks to exercise has nothing to do with untruthful or misleading speech on its part." (*Ibid.*)

The majority's application of the rational basis standard is inconsistent with the language and history of article I's free speech provision. The language of our constitutional provision is broader than the First Amendment, and it originated during a period in our history when legislatures and courts alike did not interfere with commercial speech, save to correct fraud or misleading statements. As *Gerawan I* observed, our Constitution has a history of protecting commercial speech that long predated its federal counterpart. We observed in *Gerawan II* that if we find a statute implicates the right of free commercial speech, in light of the broad language of our constitutional provision and its strong history of protecting

5

commercial speech, it would be "incongruous" to apply "only minimal scrutiny." (*Gerawan II, supra,* 33 Cal.4th at p. 21.)

The reasoning of the *Gerawan* cases cannot simply be distinguished away on their facts. Although the present case involves the compulsion to speak rather than the compulsion to fund speech, *Gerawan I* made no distinction between the two. (See *Gerawan I, supra,* 24 Cal.4th at p. 491.) Indeed, the funding of speech was objectionable there *because* it implicated the right not to speak. (*Id.* at p. 514 ["One does not speak freely when one is restrained from speaking. But neither does one speak freely when one is compelled to speak."].) That is precisely the right implicated here, as the majority acknowledges. (See maj. opn., *ante*, at pp. 9-16.)

Because free speech is implicated, *Gerawan II* teaches that the applicable standard is intermediate scrutiny. In formulating the proper test for intermediate scrutiny under our constitution, *Gerawan II* concluded the test of *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 (*Central Hudson*), "appropriately protects the free speech rights article I was designed to safeguard" in the commercial speech context, which "neither warrants application of the strictest scrutiny reserved for such matters as the censorship or compelled utterance of noncommercial speech [citations], nor can it pass muster simply because it is rationally based." (*Gerawan II, supra,* 33 Cal.4th at p. 22.) Thus, rather than create a new formulation, we adopted the test articulated in *Central Hudson* because it was a workable standard that adequately protected the right of free commercial speech under article I's free speech provision.

The *Gerawan* cases noted some narrow exceptions to this rule, but none apply here. As the majority acknowledges (see maj. opn., *ante*, at p. 30), section 2527 does not compel speech for the purpose of correcting false or misleading statements. (See *Gerawan II, supra,* 33 Cal.4th at p. 22.) *Gerawan I* observed, if

6

"the commercial speaker's message is already truthful and nonmisleading, however, compulsion of speech is not supported by the consumer protection rationale, but must be supported, if at all, by some rationale applicable to all speech, noncommercial as well as commercial." (*Gerawan I, supra,* 24 Cal.4th at p. 498.)

No such general rationale exists here. Section 2527 is "not self-evidently incidental to the functioning of some important, legislatively established institution, such as a union shop or an integrated state bar . . . ." (*Gerawan II, supra,* 33 Cal.4th at p. 22.) In the First Amendment context, the United States Supreme Court in *United States v. United Foods, Inc.* (2001) 533 U.S. 405 (*United Foods*), distinguished its decision in *Glickman. United Foods* noted the marketing program in *Glickman* was part of a greater statutory scheme that "used marketing orders that to a large extent deprived producers of their ability to compete and replaced competition with a regime of cooperation. The mandated cooperation was judged by Congress to be necessary to maintain a stable market. Given that producers were bound together in the common venture, the imposition upon their First Amendment rights caused by using compelled contributions for germane advertising was, as in *Abood* and *Keller,* in furtherance of an otherwise legitimate program." (*United Foods*, at pp. 414-415.) By contrast, *United Foods* concluded the assessment there was not part of a " 'broader regulatory system' " and "[w]e have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself." (*Id.* at p. 415.)

There is no question here that section 2527 is *not* part of a greater regulatory scheme. It is a stand-alone statute enacted, as the majority acknowledges, only because the Legislature could not pass a bill directly regulating pharmacy reimbursement rates. (See maj. opn., *ante*, at pp. 5-7.) Thus, the provision's *only* purpose is directed at speech, to compel speech in the

particular context of a contractual relationship between prescription drug claims processors and third party payers.

The majority suggests another exception to the application of intermediate scrutiny with respect to a statute compelling speech:  The promotion of "informational transparency." (Maj. opn., *ante*, at p. 30.)  But no such exception exists.  Even assuming the federal cases cited by the majority are relevant here, they do not support this exception.  The majority quotes *44 Liquormart, Inc. v. Rhode Island* (1996) 517 U.S. 484, which stated:  "When a State regulates commercial messages to protect *consumers* from misleading, deceptive, or aggressive sales practices, or *requires the disclosure of beneficial consumer information*, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review." (*Id*. at p. 501, italics added; see maj. opn., *ante*, at p. 30.)  The majority reads too much into the italicized language.  *44 Liquormart* had nothing to do with any type of disclosure, involving instead a complete *ban* on price advertising of alcohol.  The plurality cited other recognized exceptions to the application of intermediate scrutiny, including regulation designed to curb "misleading, deceptive, or aggressive sales practices." (*44 Liquormart*, at p. 501.)  Thus, its reference to the "disclosure of beneficial consumer information" (*ibid*.) must also have been a reference to an established exception to the ordinary intermediate scrutiny standard, namely, consumer protection.  However, that established exception is not as broad as this statement would suggest.

The examples cited by the majority bear this out.  The five lower federal court cases discussed by the majority (see maj. opn., *ante*, at pp. 31-36) purported to apply *Zauderer v. Office of Disciplinary Counsel* (1985) 471 U.S. 626 (*Zauderer*).  That case involved an attorney disciplinary rule requiring that "any advertisement that mentions contingent-fee rates must 'disclos[e] whether

8

percentages are computed before or after deduction of court costs and expenses,' . . ." (*Id.* at p. 633.) In applying rational basis review rather than intermediate scrutiny, *Zauderer* reasoned: "The State has attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information *about the terms under which his services will be available*. Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, [citation] appellant's constitutionally protected interest in not providing any particular factual information in his advertising is minimal. Thus, in virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, 'warning[s] or disclaimer[s] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception.' [Citations.]" (*Id*. at p. 651, italics added, original italics removed.)

Under *Zauderer*, the principal rationales for applying a lower standard of review for compelled commercial speech are that speakers had no compelling right to refrain from disclosing accurate information about their goods or services, and such disclosures aided consumers by forestalling misleading or fraudulent statements. Indeed, *Zauderer* held "that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest *in preventing deception of consumers*." (*Zauderer, supra,* 471 U.S. at p. 651, italics added.) Thus, *Zauderer* did not contemplate that all disclosures of factual information should be subject to the lowest standard of review, but only those principally designed to protect consumers.

9

Contrary to the majority's reasoning, section 2527 is not a disclosure statute warranting application of the *Zauderer* rationale. As described by the dissenting opinion in the Ninth Circuit's panel decision, the provision is "an unusual law without clear analogies in existing precedent. . . . Essentially, it requires Business A to speak about Business B to Business C. Unlike a disclosure law, it does not require that regulated entities divulge information about themselves to the public, but rather that they privately produce information about third parties to their clients. [Citation.] Moreover, § 2527 is a stand-alone law that does nothing more than mandate speech. It is not ancillary to any comprehensive economic regulatory scheme. [Citation.]" (*Beeman v. Anthem Prescription Management* (9th Cir. 2011) 652 F.3d 1085, 1108 (dis. opn. of Wardlaw, J.), opn. vacated (9th Cir. 2011) 661 F.3d 1199.)

Nothing in the language or spirit of *Zauderer* justifies deviating from intermediate scrutiny as required by *Gerawan II*. Section 2527 does not require a disclosure intended to prevent misleading or fraudulent speech.[1] Nor does it

---

[1] See *Zauderer, supra,* 471 U.S. at page 651; see also *Milavetz, Gallop & Milavetz, P. A. v. United States* (2010) 559 U.S. 229, 250 ("The challenged provisions of § 528 share the essential features of the rule at issue in *Zauderer*. As in that case, § 528's required disclosures are intended to combat the problem of inherently misleading commercial advertisements . . . ."); *United Foods, supra,* 533 U.S. at page 416 ("There is no suggestion in the case now before us that the mandatory assessments imposed to require one group of private persons to pay for speech by others are somehow necessary to make voluntary advertisements nonmisleading for consumers."); *Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy* (1994) 512 U.S. 136, 146 (declining to apply *Zauderer* standard to a ban on attorneys using specialist designations: "We express no opinion whether, in other situations or on a different record, the Board's insistence on a disclaimer might serve as an appropriately tailored check against deception or confusion, rather than one imposing 'unduly burdensome disclosure requirements [that] offend the First Amendment.' ").

require a disclosure aimed at consumer protection or public health.[2]  Further distinguishing it from a traditional consumer disclosure statute, the provision does not require information about the entity compelled to speak or about the underlying transaction at issue.  The statute compels prescription drug claims processors to compile data concerning prices charged by unrelated third parties, in transactions involving uninsured patients at retail.  These transactions have nothing to do with insurance claims or reimbursements.  Indeed, the *sole* purpose of requiring the transmittal of this data is to "persuade insurers to increase their reimbursement rates to pharmacies to more closely match the private-pay fees." (*ARP Pharmacy Services, Inc. v. Gallagher Bassett Services, Inc.* (2006) 138 Cal.App.4th 1307, 1320 (*ARP Pharmacy Services*).)

The majority's attempt to analogize section 2527 to various consumer disclosure statutes is not sustainable.  At their core, ordinary disclosure laws are intended to level the playing field between economic actors of uneven strength.  These disclosure laws usually require businesses to provide pertinent information to consumers, information about the businesses or their products that are readily and easily ascertained by the businesses themselves but would be prohibitively difficult for consumers to obtain on their own.  These disclosures give consumers information that illuminate and clarify the nature of the transactions they face, i.e.,

---

[2]  See *Gerawan I, supra,* 24 Cal.4th at page 498; see also *New York State Restaurant v. New York City Bd.* (2d Cir. 2009) 556 F.3d 114, 134 (restaurant calorie disclosure regulation enacted to "(1) reduce consumer confusion and deception; and (2) to promote informed consumer decision-making so as to reduce obesity and the diseases associated with it"); *Environmental Defense Center, Inc. v. U.S. E.P.A.* (9th Cir. 2003) 344 F.3d 832, 850 ("[i]nforming the public about safe toxin disposal is non-ideological"); *National Elec. Mfrs. Ass'n v. Sorrell* (2d Cir. 2001) 272 F.3d 104, 115 ("Vermont's interest in protecting human health and the environment from mercury poisoning is a legitimate and significant public goal.").

they attempt to tell consumers what they are getting themselves into *before* they do so. Armed with this type of information, consumers are placed in a position closer to equal footing with those businesses.

Rather than leveling the scale, section 2527 serves to tip the scale in one direction. The statute is not intended to make two unequal actors more equal, but rather is intended to affect the *outcome* of negotiations between two *equal* actors. There is no doubt that the parties affected by the provision, prescription drug claims processors and payers, are sophisticated business entities. If insurance companies deemed information regarding retail drug pricing relevant to their business, they could easily contract to secure that information from prescription drug claims processors. Whether one large, sophisticated corporate entity provides such information to a similarly sophisticated entity within the context of a private agreement should be a matter left to negotiation between them, just like any other provision of a contract between corporations. Section 2527 requires one party to the contract to engage in speech *for the sole purpose of potentially modifying a term of a privately negotiated contract*. This imposition serves no leveling function and has absolutely nothing to do with protecting consumers or providing the public with relevant information. It is an attempt by the government to put its thumb on the scale, with the goal of achieving indirectly what it could not accomplish directly. Simply put, the government has taken sides, resorting to compelled speech to promote its vision of what this private contract should look like. Such a purpose hardly warrants deviating from the historical protection of commercial speech as embodied in article I and articulated in our *Gerawan* decisions.

The majority seeks to bolster its position by asserting that section 2527 has a "public purpose," noting that increased reimbursement rates might increase pharmacy participation, thus providing consumers more choice. (Maj. opn., *ante*,

12

at p. 38; *ARP Pharmacy Services, supra,* 138 Cal.App.4th at p. 1320.) One would hope that when the Legislature passes any law it does so with appropriate public regard. Simply because a provision has some kind of perceived public interest does not transform it into a consumer or public protection statute justifying a lower standard of review under *Zauderer*. The Legislature may determine that having higher reimbursement rates would ultimately benefit the public. The Legislature may pass any number of laws to this end, including directly regulating reimbursement rates. But the Legislature's preference, by itself, does not justify intrusion into protected speech rights. For example, the government's stance against prostitution, while supporting the passage of criminal laws prohibiting prostitution,[3] does not justify conditioning government funding upon adopting a policy against prostitution. (See *AID v. Alliance for Open Society Internat.* (2013) __ U.S. __ [133 S.Ct. 2321, 2327-2332].) The government's stance against smoking, while supporting increased taxes on cigarettes or a ban on cigarette smoking in certain public places,[4] does not justify compelled speech in the form of graphic images intended to further "an ongoing effort to discourage consumers from buying" cigarettes. (*R.J. Reynolds Tobacco Co. v. Food and Drug Admin.* (D.C. Cir. 2012) 696 F.3d 1205, 1216 (*R.J. Reynolds*) [applying intermediate

---

[3] See *People v. Pulliam* (1998) 62 Cal.App.4th 1430, 1438 (statute criminalizing loitering to commit prostitution "does not prohibit protected speech"); *People v. Maita* (1984) 157 Cal.App.3d 309, 316 ("It has been flatly held that '[t]he governmental interest in preventing [prostitution] is unrelated to speech or press.' ").

[4] See *Roark & Hardee LP v. City of Austin* (5th Cir. 2008) 522 F.3d 533, 549-550 (rejecting 1st Amend. challenge against an ordinance banning smoking in enclosed public spaces); *U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.* (D.Mass. 2000) 115 F.Supp.2d 35, 43 ("the tax codes are filled with examples of taxes intended precisely to get people to avoid them, thus discouraging certain unwanted activities (such as excessive smoking or the early withdrawal of retirement savings)"); see also *Department of Revenue of Mont. v. Kurth Ranch* (1994) 511 U.S. 767, 782 (noting that "[b]y imposing cigarette taxes . . . a government wants to discourage smoking").

scrutiny].) In short, a public purpose that may justify a general law not implicating speech does not necessarily fall within the narrow *Zauderer* rationale justifying a lower standard of review with respect to a law that *does* implicate speech. Indeed, any other conclusion would all but eviscerate the commercial speech protections of article I.

The majority suggests that applying intermediate scrutiny here would "mak[e] the free speech clause into a warrant for courts to superintend the Legislature's economic policy judgments." (Maj. opn., *ante*, at p. 36.) Not so. Section 2527 is a unique and unprecedented statute. It is nothing like any other disclosure statute and does not serve the leveling function usually provided by such statutes. It does not require a disclosure to prevent consumer confusion or fraud, further public health or safety, or inform the public about a particular transaction or entity. Nor is it part of a comprehensive regulatory scheme; it is a single statute directed only at speech, in one industry, designed to influence contractual bargaining between sophisticated business entities. The statute involves *none* of the factors previously cited to warrant a lesser standard of review. The majority fails to explain how application of the intermediate scrutiny standard of *Gerawan II* under such circumstances would call into question the legitimacy of any other true disclosure statute. Contrary to the majority's reasoning, judicial restraint counsels against deviating from our precedents by applying a lesser and unwarranted standard of review.

The majority asserts that section 2527 does not "reflect paternalism toward participants in the marketplace" (maj. opn., *ante*, at p. 27), but merely requires prescription drug claims processors to provide objective information with which "they do not identify any disagreement" (maj. opn., *ante*, at p. 21). The latter assertion is somewhat misleading. Prescription drug claims processors may have no quarrel regarding the *accuracy* of the data required to be reported. However,

14

they vehemently disagree that this data is at all *relevant* in determining proper reimbursement rates and that they can be forced to compile and disseminate it. The statute's requirement reflects the *government's* conclusion that such information *is* relevant in setting reimbursement rates and should be considered, even when these contractual entities have not seen fit to compile and consider such information on their own. Concluding that the government knows better than sophisticated actors in the marketplace as to how best they might protect their own interests is paternalism writ large.

Applying the *Central Hudson* standard to our constitutional free speech provision, intermediate scrutiny review asks: (1) Is the speech protected under article I? (2) Is the asserted governmental interest substantial? If one gives affirmative answers to these questions, then: (3) Does the law directly advance the asserted governmental interest? (4) Is it more extensive than required to serve that interest? (*Gerawan II, supra,* 33 Cal.4th at p. 22; *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 952; see *Central Hudson, supra,* 447 U.S. at p. 566.)

Section 2527 fails this test. With respect to the first prong, the statute involves protected speech, as the majority agrees.

Whether the asserted governmental interest supporting the provision is substantial may be debated. As noted, "[t]he theory was that if insurers paid the pharmacies dispensing fees closer to the amount paid by uninsured consumers, pharmacies would be more likely to continue to contract with insurers, and insured consumers would be able to have their prescriptions filled at the pharmacies of their choice." (*ARP Pharmacy Services, supra,* 138 Cal.App.4th at p. 1320.)

Even assuming the government's interest in raising reimbursement rates is substantial, section 2527 fails to directly advance this interest. There is no question that the Legislature has the authority to directly regulate the rate paid by insurance companies to pharmacies, without any impingement upon free speech.

15

As the majority acknowledges, the Legislature declined to pass such a law. (Maj. opn., *ante*, at pp. 5-7.) Failing at that, the Legislature passed a statute that compelled speech in a way that the majority acknowledges "could potentially affect prescription drug reimbursement rates." (Maj. opn., *ante*, at p. 25.) "The mere transmission of the information, unaccompanied by any requirement that it be considered, utilized, or even read by the insurers, seems poorly designed to accomplish the state's goal." (*ARP Pharmacy Services, supra,* 138 Cal.App.4th at p. 1320.) Such an ineffectual law hardly justifies the statute's intrusion into free speech rights.

Further, the fit between the governmental goal of increasing reimbursement rates and section 2527's speech requirement is not sufficiently close to pass muster under intermediate scrutiny. The fit need not be perfect, only reasonable; " ' "not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." ' [Citation.]" (*Gerawan II, supra,* 33 Cal.4th at p. 23.) The majority asserts that the statute made available "commercial information that was previously unavailable and potentially could not be provided by pharmacies because of antitrust constraints." (Maj. opn., *ante*, at p. 27.) This assertion seems doubtful. As *ARP Pharmacy Services* observed, "a restraint on direct negotiation is not a prohibition on gathering and reporting the statistical information called for by section 2527." (*ARP Pharmacy Services, supra,* 138 Cal.App.4th at p. 1321.) No law precludes pharmacies from compiling data *regarding their own charging practices*, or from disseminating such information to the public at large. Compelling speech from an unwilling party when the same speech can easily be voluntarily provided by a *willing* party hardly provides a proper fit between the government's objectives and the intrusion into protected speech rights. Rather than making available

16

previously unavailable data, section 2527 does two things. (1) It shifts the cost of compiling and disseminating such data from pharmacies to prescription drug claims processors. (2) It increases the likelihood that the data will be seen by insurance companies and other third party payers because it is specifically targeted at them, as opposed to the public generally. There is simply no justification for the former. As for the latter, the vague hope that payers will consider the data because it is directed at them hardly warrants requiring compelled speech. (Cf. *R.J. Reynolds, supra,* 696 F.3d at pp. 1217-1221 [concluding that rules requiring graphic warnings on cigarette packages did not pass intermediate scrutiny, in part because they went beyond disclosing health effects of smoking and were intended to discourage smoking].)

In sum, our Constitution has a rich history of protecting commercial speech, one that predates the protections of the First Amendment. The free speech right includes the right *not* to be compelled to speak. Under our precedents, any law infringing upon that right must be evaluated under intermediate scrutiny, unless it falls within some narrow exceptions. Those recognized exceptions, including statements required to prevent fraud, cure misleading statements, protect consumers, or protect public health and safety, do not apply to section 2527. The provision is a unique statute requiring speech by one contractual party to another in the hope of altering a term of their contract in a way deemed preferable by the government. It is doubtful that our state's founding fathers, adherents to the principles of Jacksonian democracy and economic individualism, would have countenanced such government-compelled speech within private, arms-length

17

negotiations between sophisticated business entities, for the purpose of promoting a particular outcome. I would hold that section 2527 is subject to intermediate scrutiny under article I and that it fails such scrutiny.

**CORRIGAN, J.**

**I CONCUR:**

**CHIN, J.**

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Jerry Beeman v. Anthem Prescription Management
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S203124
**Date Filed:** December 19, 2013
_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Morrison & Foerster, Shirley J. Hufstelder and Benjamin J. Fox for Defendant and Appellant Argus Health Systems, Inc.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Gail E. Lees, Christopher Chorba, Blaine H. Evanson; Husch Blackwell, Thomas M. Dee and Christopher A. Smith for Defendant and Appellant Express Scripts, Inc.

Morgan, Lewis & Bockius, Thomas M. Peterson, Molly Moriarty Lane and Richard S. Odom for Defendant and Appellant Anthem-Prescription Management, LLC.

Steptoe & Johnson, Martin D. Schneiderman and Jason Levin for Defendants and Appellants AdvancePCS, AdvancePCS Health L.P., PharmaCare Management Services, Inc., and TDI Managed Services, Inc.

Holland & Knight, Richard T. Williams and Tara L. Cooper for Defendants and Appellants PharmaCare and TDI Managed Services.

Heller Ehrman, Richard S. Goldstein, John M. Landry; Orrick, Herrington & Sutcliffe and Richard S. Goldstein for Defendant and Appellant Medco Health Solutions, Inc.

Troutman Sanders, C. Leeann McCurry; Musick, Peeler & Garrett and Kent A. Halkett for Defendant and Appellant Benescript Services, Inc.

Pillsbury Winthrop SHaw Pittman, Thomas N. Makris and Brian D. Martin for Defendant and Appellant First Health Services Corp.

Roxborough, Pomerance & Nye, Roxborough, Pomerance, Nye & Adreani, Craig Pynes, Nicholas P. Roxborough and Marina N. Vitek for Defendant and Appellant National Medical Health Card.

**Counsel:**

Snell & Wilmer and Sean M. Sherlock for Defendant and Appellant Restat, LLC.

Reed Smith, Kurt C. Peterson, Margaret M. Grignon, Kenneth N. Smersfelt, Judith E. Posner and Brett L. McClure for Defendant and Appellant Tmesys, Inc.

Sonnenschein Nath & Rosenthal, David S. Alverson, Stephen J. O'Brien, Rachel M. Milazzo; SNR Denton, Stephen J. O'Brien and Rachel M. Milazzo for Defendant and Appellant Cardinal Health MPB, Inc.

Hogan & Hartson, Hogan Lovells US and Neil R. O'Hanlon for Defendant and Appellant Mede America Corporation.

Dykema Gossett, J. Kevin Snyder and Vivian I. Kim for Defendant and Appellant Prime Therapeutics.

Kirtland & Packard and Robert A. Muhlbach for Defendant and Appellant RX Solutions, Inc.

McDermott, Will & Emery, Robert Mallory and Matthew Oster for Defendant and Appellant WHP Health Initiatives.

Deborah J. La Fetra and Lana Harfoush for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Appellants.

The Consumer Law Group, Alan M. Mansfield; Peitzman Weg and Michael A. Bowse for Plaintiffs and Respondents.

Seth E. Mermin, Thomas Bennigson and Timothy Sun for Consumer Action, Consumers for Auto Reliability and Safety, The Public Health Law Center, Inc., and Public Good Law Center as Amici Curiae on behalf of Plaintiffs and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Theodore J. Boutrous, Jr.
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Michael A. Bowse
Peitzman Weg
2029 Century Park East, Suite 3100
Los Angeles, CA  90067
(310) 552-3100